IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| KENNETH WALTON GEORGE, DENNIS REED BOWEN, CLYDE FREEMAN, GEORGE MOYERS, JIM MATTHEWS, and HENRY MILLER, on their own behalf and on behalf of a class of persons similarly situated, | ) ) ) ) ) ) ) | C/A No.: 8:06-cv-373-RBH |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| DUKE ENERGY RETIREMENT CASH BALANCE PLAN and DUKE ENERGY CORPORATION, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

Pending before the court are: 1) Defendants' [Docket Entry #83] motion for judgment on the pleadings; 2) Plaintiffs' [Docket Entry #98] motion for partial summary judgment; 3) Defendants' [Docket Entry #106] cross motion for partial summary judgment; and 4) Plaintiffs' [Docket Entry #116] motion to amend the scheduling order and the complaint. The court held a hearing on the above-mentioned motions on December 19, 2007.

Also pending before the court is Plaintiffs' motion to certify class [Docket Entry #33], which will be addressed in a subsequent order.

## Background

Plaintiffs brought this lawsuit against Duke Energy Corporation and the Duke Energy Retirement Cash Balance Plan (collectively referred to as "Duke"). This case arises from Duke's conversion of its traditional defined benefit plan to a cash balance plan. Under the traditional defined benefit plan, benefits were calculated using a formula based on factors

including years of participation in the plan and the employee's annual salary. In January 1997, Duke converted its traditional defined benefit plan to a cash balance plan. Cash balance plans, sometimes referred to as hybrid plans, are defined benefit plans that combine attributes of a 401(k) plan (defined contribution plan[1]) and a traditional pension plan (defined benefit plan[2]). The basic cash balance formula consists of a pay or compensation credit and an interest credit similar to the salary contribution and investment return of a 401(k) plan. Compensation credits end after a participant terminates employment but the interest credits continue until the participant withdraws his benefit.

Under the cash balance formula used by Duke in the implementation of its Cash Balance Plan, participants were assigned initial cash balance accounts. The cash balance accounts are hypothetical accounts to the extent that separate individual accounts were not actually established for each participant. The hypothetical cash balance accounts were set up alongside the participant's frozen accrued benefit under the prior Duke plan. The Plan provides that once an employee has vested in the Plan through five years of participation, he can elect to receive his retirement benefit in a lump sum payment or in an annuity. Before the benefit is paid, the employee's hypothetical account is converted into a dollar benefit based on actuarial

---

[1]     Under ERISA, "defined contribution plan" means "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). "Under defined-contribution plans, the employer does not guarantee a retirement benefit to the employee. The employee bears the risk of any investment, even if the investment reduces the amount of their retirement account." *In re J.P. Morgan Chase Cash Balance Litigation*, 460 F. Supp. 2d 479, 481 (S.D.N.Y. 2006).

[2]     Under ERISA, a "defined benefit plan" means "a pension plan other than an individual account plan." 29 U.S.C. § 1002(35). Thus, defined benefit plans include all plans that do not meet the definition of a defined contribution plan. A defined benefit plan is "one where the employee is promised a retirement benefit based on a formula set forth in the plan." *In re J.P. Morgan Chase*, 460 F. Supp. 2d at 481.

assumptions stated in the Plan.

Under ERISA, a plan amendment may not decrease, or "cut-back," previously accrued benefits. 29 U.S.C. § 1054(g). In an attempt to ensure that the plan did not reduce a participant's accrued benefit, the Plan utilized a "greater of" formula, which converted the hypothetical cash balance account to an annuity, then compared it to the frozen accrued benefit under the prior Duke plan. The participant is then entitled to receive the greater of their frozen benefit under the prior plan, or the amount of their cash balance account. If the opening balance in the cash balance account is less than the value of the frozen accrued benefit under the prior plan, the credits earned under the Cash Balance Plan will not result in larger retirement benefits until they exceed the value of the frozen benefit.

Plaintiffs allege that when Duke converted its pension plan to a cash balance plan on January 1, 1997, it violated the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"). Plaintiffs' initial complaint contained six causes of action.[3]

Count one alleges an ERISA age discrimination claim under 29 U.S.C. § 1054(b). Plaintiffs maintain that Duke factors age into the calculation of interest credits, which results in older employees/participants receiving less interest credits than younger employees/participants. Plaintiffs contend that calculating interest credits in such a way violates § 1054(b), which prohibits reduction of an employee's rate of benefit accrual because of that employee's age.

---

[3]     Plaintiffs have filed a motion to amend the scheduling order and complaint seeking to add: 1) a seventh cause of action based on Duke's alleged failure to provide notice of the plan conversion under 29 U.S.C. § 1054(h); and 2) additional factual allegations under an existing cause of action (count six - breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)).

Plaintiffs seek a declaration that the Plan violates § 1054(b) and that Duke be required to restore all lost interest credits to participants plus any loss of benefits arising from the failure to properly award credits.  Plaintiffs also request that Duke be required to pay participants any lost benefits arising from the alleged failure to properly pay interest credits and that any such payment be based on a single life age 65 annuity.

Count two alleges a disparate treatment claim and a disparate impact claim under the ADEA.  Plaintiffs allege that Duke knowingly and willfully adopted a cash balance plan that discriminated against employees over the age of 40.  Similiar to count one of the complaint, Plaintiffs' disparate treatment claim is based on the allegation that Duke reduces the rate of an employee's benefit accrual because of age.  Plaintiffs' disparate impact claim appears to be based upon the allegation that the implementation of the Plan resulted in a "wear away" effect of Plan benefits, which disparately impacted individuals over the age of 40.[4]  Plaintiffs contend that Duke knew or recklessly disregarded the fact that employees over the age of 40 would disproportionately suffer as a result of the conversion in that the conversion would effectively freeze benefit accruals for most employees over the age of 40.  Plaintiffs seek an award of the

---

[4]    Plaintiffs describe the "wear away" effect as follows:

> Transition provisions for the Cash Balance Plan provided that participants would receive the greater of the accumulated pension benefits to which they were already eligible under the old plan, or the amount hypothetically calculated for the new cash balance account.  As a result of how the initial cash balance account was calculated and this transition provision, most employees earned no additional retirement benefits for a number of years beyond those to which they were already eligible under the defined benefit plan's retirement provisions.  This meant that a "wear away" period ensued in which employees' new cash balance amount, beginning much lower than their frozen benefit under the old plan, increased each year but did not reach the level of the benefit under the old plan.  During this "wear away" period, there was no growth to the amount of benefits employees had under the old plan as of December 31, 1996.  Many employees retired before their "wear away" period ended.  [Complaint, at ¶ 45].

4

lost benefit accruals resulting from the conversion as well as liquidated amounts based on such lost benefit accruals.

Count three alleges an ERISA claim for benefits under 29 U.S.C. § 1132(a)(1). Plaintiffs state that Duke failed to properly calculate the lump sum distributions that participants are entitled to under the Plan.  Plaintiffs allege that Duke, rather than using the appropriate interest rate to reduce participants' retirement benefit to present value, used an interest rate that deprives participants of the full benefit promised under the Plan.  Plaintiffs contend that Duke's method of calculating lump sum distributions effectuates an unlawful reduction in accrued retirement benefits in violation of ERISA's anti-cut back rule, 29 U.S.C. § 1054(g), and the express terms of the Plan.  Plaintiffs seek a declaration that Duke's method of calculating lump sum distributions violates ERISA's anti-cut back provisions and the express terms of the Plan.  Plaintiffs also request that Duke be required to restore any lost benefits resulting from Duke's alleged unlawful calculation of lump sum distributions.

Count four also alleges an ERISA claim for benefits under 29 U.S.C. § 1132(a)(1). Plaintiffs allege that during the 1997 and 1998 Plan years, Duke failed to follow the procedure specified in the Plan for calculating the appropriate interest rate credit.  Plaintiffs allege that as a result of this failure, participants who received lump sum distributions or monthly annuity payments did not receive the full amount they were entitled to under the Plan.  Plaintiffs further allege that participants who have not yet retired will not receive the full amount of benefits they are entitled to unless the error in calculation is corrected and an appropriate

5

amount is credited to their "hypothetical" accounts.[5]  Plaintiffs seek a declaration that Duke erroneously calculated interest credits during the 1997 and 1998 Plan years and that such error resulted in the wrongful denial of benefits to retirees.  Plaintiffs request that Duke be required to restore any lost benefits resulting from their alleged erroneous calculation of interest credits.

Count five alleges that the implementation of the Cash Balance Plan resulted in an impermissible back loading of benefits.  According to Plaintiffs, the Plan used an approximate 7 percent interest rate to calculate the present value of accrued benefits under the prior plan.  Plaintiffs allege that because accruals under the Cash Balance Plan were based on a lower interest rate, the present value of accrued benefits under the prior plan was substantially greater than the accrued benefits under the cash balance formula.  Plaintiffs allege that under the Cash Balance Plan participants do not accrue any additional benefits until the value of their hypothetical cash balance account exceeds the present value of accrued benefits under the prior plan.  Thus, Plaintiffs contend that the manner in which Duke implemented the Cash Balance Plan effectively froze accrual rates for employees with long-term service in violation of 29 U.S.C. § 1054(b).  Plaintiffs seek a declaration that Duke back loaded accruals in violation of § 1054(b)(1) and (2).  Plaintiffs also request that Duke be required to restore any lost benefits resulting from Duke's alleged unlawful back loading of benefits and that Duke be ordered to retroactively reform the Plan so that it complies with § 1054(b)(1).

---

[5]        Plaintiffs state that pursuant to the cash balance formula, participants were assigned initial cash balance accounts.  The cash balance accounts are "hypothetical" accounts in that separate individual accounts were not actually established for each participant as with a 401(k) or other defined contribution plan.

6

Count six alleges Duke breached its fiduciary duties owed under ERISA.[6]    In particular, Plaintiffs allege that Duke breached its fiduciary duties by misleading employees about the effects of the conversion to the Cash Balance Plan and the purpose behind certain amendments to the Plan concerning the calculation of interest credits.  Plaintiffs also contend that Duke and/or its designee breached its fiduciary duties by committing numerous errors in the calculation of opening account balances and/or the calculation of interest credits.  Plaintiffs further allege that Duke breached the standards of care in the manner in which it administered the Cash Balance Plan by arbitrarily changing opening account balances in attempts to circumvent the notice requirements of § 1054(h) of ERISA.  Finally, Plaintiffs allege that Duke breached its duty of reasonable care when it allowed the Cash Balance Plan to operate in violation of ERISA and failed to correct, among other things, the problems related to lump sum distributions, back loading of benefits, and aged based benefits accrual.  Plaintiffs request that Duke be required to reform the Cash Balance Plan so that it is in compliance with the applicable laws.  Plaintiffs further request that Duke be required to recalculate participants/beneficiaries' benefits under the revised and reformed Plan and pay restitution to the Plan participants.  Additionally, Plaintiffs seek the appointment of an independent auditor to review the Cash Balance Plan and all cash balance accounts.

---

[6]    In their motion to amend the scheduling order and complaint, which is discussed more fully below, Plaintiffs seek to add additional factual allegations concerning their breach of fiduciary duty claim and a seventh cause of action.  Although Duke opposes the addition of a seventh cause of action, Duke has indicated that it consents to the amendment of the complaint to add additional factual allegations under the breach of fiduciary duty cause of action.  Because Duke does not oppose the proposed amendment as to additional factual allegations, the court will address Plaintiffs' breach of fiduciary duty cause of action as it is pled in the amended complaint. *See* [Amended Complaint, Docket Entry #116-2, at ¶¶ 114-122].

**Discussion**

I.     Motion for Judgment on the Pleadings

    A.     Rule 12(c) Standard

When reviewing a motion made under Federal Rule of Civil Procedure 12(c), the court applies the same standard applicable to motions made under Rule 12(b)(6). *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405-6 (4th Cir. 2002); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The court must "accept all well-pleaded allegations in the plaintiff's complaint as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards*, 178 F.3d at 244. The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S.Ct. at 1969. A complaint attacked by a motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *see also*, *Giarratano v. Johnson*, 521 F.3d 298, 2008 WL 771503, at *4 (4th Cir. March 25, 2008); *Self v. Norfolk Southern Corp.*, No. 07-1242, 2008 WL 410284, at *1 (4th Cir. February 13, 2008) (unpublished).

    B.     Count One (ERISA Age Discrimination)

Count one alleges that Duke factors age into the calculation of interest credits, which results in older employees/participants receiving less interest credits than younger employees/participants. Plaintiffs contend that calculating interest credits in such a way violates 29 U.S.C. § 1054(b) of ERISA. Plaintiffs allege that: 1) under the Plan's scheme for

crediting the hypothetical cash balance account, a participant's benefit accruals (expressed as an age 65 annuity) decrease as the participant ages; 2) the cash balance formula used by Duke for determining benefits reduces a participant's accrued benefit solely on increases in age or service; and 3) the rate of an employee's benefit accrual under the Cash Balance Plan decreases on account of the employee's age. [Complaint, at ¶¶ 61-62]. Simply stated, Plaintiffs contend that Plan participants over the age of 40 were damaged because, as a result of the conversion to the Plan, they will receive less interest credits before retirement than younger participants. *Id.* at ¶ 90.

Under ERISA, a defined benefit plan is impermissibly age discriminatory "if, under the plan, an employee's benefit accrual is ceased, or the *rate of an employee's benefit accrual* is reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(i). Duke argues that count one should be dismissed because Plaintiffs have failed to state a claim of age discrimination under ERISA. Specifically, Duke argues that neither the Plan's rate of benefit accrual nor the Plan's benefit accrual terms discriminate against employees "because of the attainment of any age." Duke contends that benefits accrue through monthly allocation of credits. Duke further contends that pay credits increase with age and service, and all participants receive the same interest rate, regardless of their age. However, Plaintiffs state that under the Cash Balance Plan age discrimination arises because older workers accrue their retirement benefits at a slower rate than similarly situated younger workers. Plaintiffs state that younger workers have more years to receive interest credits in their hypothetical accounts. Because older workers have fewer years in which to earn their interest credits, Plaintiffs contend that the conversion of the hypothetical account balance into an age 65 annuity results

9

in a smaller retirement benefit for older workers.

This issue involves a matter of statutory interpretation. Specifically, whether the phrase "rate of an employee's benefit accrual" refers to the employer's contributions to the plan (inputs), or the employees' actual retirement benefits (outputs).[7] Duke argues that the plain meaning of the statute indicates that the "rate of an employee's benefit accrual" is necessarily the periodic rate of increase specified by the plan formula, the input not the output of that formula. Plaintiffs, on the other hand, contend that "rate of benefit accrual" refers to the benefit, i.e. the output, from the plan.

Plaintiffs argument hinges upon the distinction between defined benefit plans and defined contribution plans. Plaintiffs argue that with defined benefit plans, employees are promised a "defined benefit." However, with defined contribution plans, employees are promised a "defined contribution." Because Duke's Cash Balance Plan is a defined benefit plan under ERISA, Plaintiffs contend that the employee/participant in the Cash Balance Plan is therefore promised and entitled to receive a defined benefit. Accordingly, Plaintiffs maintain that the ERISA age discrimination provision applicable to defined benefit plans, which utilizes the phrase "rate of . . . benefit accrual," must be read to refer to the benefit, i.e. the output. In short, Plaintiffs read 29 U.S.C. § 1054(b)(1)(H)(i) to prohibit a <u>reduction in the amount an employee will ultimately receive</u>, or as stated by Duke, a <u>reduction in the rate of an employee's accrued benefit</u>, because of the attainment of any age. Duke reads § 1054(b)(1)(H)(i) to prohibit a <u>reduction in the rate an employee accrues benefits</u> because of the

---

[7]     The issue raised in the parties' respective motions for partial summary judgment is limited to the meaning of the phrase "rate of an employee's benefit accrual" and/or whether Duke's Cash Balance Plan violates ERISA's anti-age discrimination provision.

attainment of any age, regardless of the amount the employee will ultimately receive.

By way of example, Plaintiffs argue that Duke's Cash Balance Plan is age discriminatory because an employee with 15 years of service who was 55 years of age on the date the Cash Balance Plan was adopted will receive less interest credits and therefore a lower retirement benefit than an employee with 15 years of service who was 35 years of age on the date the Cash Balance Plan was adopted.

Thus far, the Third,[8] Sixth[9] and Seventh[10] Circuits have addressed ERISA age discrimination claims under 29 U.S.C. § 1054(b)(1)(H)(i) stemming from the conversion of traditional pension plans to cash balance plans and each has rejected plaintiffs' claims of age discrimination under ERISA.

The Seventh Circuit, in *Cooper v. IBM Pers. Pension Plan*, was the first Court of Appeals to address the issue of whether cash balance plans were inherently age discriminatory.

---

[8]       *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56, 70 (3d Cir. 2007) (stating that "[t]he circumstance that the same contribution in the form of interest credits may result in a more valuable annuity for a younger employee is not discrimination in whole or in part based on age; rather it is the completely appropriate consequence of the application of an age-neutral principle to an accumulating account of the time value of money").

[9]       *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 612 (6th Cir. 2007) (concluding that "[t]he contention that cash balance plans are necessarily age discriminatory under the terms of § [1054] (b)(1)(H)(i) fails, however, because that provision of ERISA addresses only the employer's contributions [inputs] to the benefit plan, and any disparity in the benefits that employees of different ages receive from cash balance plans is merely the result of the time value of money").

[10]      *Cooper v. IBM Pers. Pension Plan*, 457 F.3d 636, 639 (7th Cir. 2006) (concluding "that 'benefit accrual' (for defined benefit plans) and 'allocation' (for defined contribution plans) both refer to the employer's contribution [input] rather than the time value of money between contribution and retirement"). Rejecting plaintiffs' claim and the district court's holding that cash balance plans were inherently age discriminatory because younger employees receive interest credits for more years before retirement than older employees, Circuit Judge Easterbrook stated that "[n]othing in the language or background of § [1054](b)(1)(H)(i) suggests that Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings.  Treating the time value of money as a form of discrimination is not sensible." *Cooper*, 457 F.3d at 639.

457 F.3d 636 (7th Cir. 2006).  In *Cooper*, the plaintiffs were older participants in IBM's cash balance defined benefit plan.

The district court ruled in favor of the plaintiffs and concluded that Congress intended the term "benefit accrual" as it is used in § 1054(b)(1)(H)(i) to mean "accrued benefit." *Cooper v. IBM Pers. Pension Plan*, 274 F. Supp. 2d 1010, 1022 (S.D. Ill. 2003).  The term "accrued benefit" is defined as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A).  The district court opined that "cash balance arrangements are defined benefit plans and, therefore, measure accrued benefits in terms of annuities, not in terms of the contributions themselves." *Cooper*, 274 F. Supp. 2d at 1021.  Describing the underlying arithmetic of cash balance arrangements, the district court stated "each year, as a cash balance participant ages, the same contribution made for her in the previous year declines in value in annuity terms." *Id*.  The district court rejected IBM's "time value of money" argument and found that IBM's cash balance plan did not comport with the literal and unambiguous provisions of § 1054(b)(1)(H). *Id*. at 1022.  The district court noted that "interest credits will always be more valuable to a younger employee as opposed to an older employee." *Id*. at 1021.

The Seventh Circuit reversed concluding that "[t]he phrase 'benefit accrual' reads most naturally as a reference to what the employer puts in (either in absolute terms or as a rate of change), while the defined phrase 'accrued benefit' refers to outputs after compounding." *Cooper*, 457 F.3d at 639.  The court found support for its conclusion in proposed Treasury Department regulations.  The draft regulations state "the rate of benefit accrual . . .is the

12

increase in the participant's accrued normal retirement benefit for the year." 67 Fed. Reg. 76123, 76125 (Dec. 11, 2002). "[T]he rate of benefit accrual under an eligible cash balance plan . . . is permitted to be determined as the additions to the participant's hypothetical account for the plan year, except that previously accrued interest credits are not included in the rate of benefit accrual." 67 Fed. Reg. at 76126. Thus, the Treasury Department looks at the rate of contribution when determining the rate of benefit accrual, rather than the output from the plan at normal retirement age. *Cooper*, 457 F.3d at 640.

The Seventh Circuit also compared the anti-discrimination provision applicable to defined benefit plans (29 U.S.C. § 1054(b)(1)(H)(i)) with the anti-discrimination provision applicable to defined contribution plans (29 U.S.C. § 1054(b)(2)(A)). *Id*. at 638. The defined contribution plan anti-discrimination provision provides that "[a] defined contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(2)(A). The defined benefit plan anti-discrimination provision, at issue in the present case, provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(i). The court stated that "[t]hese appear to say the same thing, except that the rule for defined-benefit plans tells us what is not allowed, while the rule for defined-contribution plans tells us what works. Either way, the employer can't stop making allocations (or accruals) to the plan or change their rate on account of age." *Cooper*, 457 F.3d at 638.

13

Because every employee covered under the IBM plan receives the same 5% pay credit and the same interest credit per annum, the court concluded that IBM's plan did not discriminate against older employees. *Id*. at 642.  Interestingly, the court explained that IBM's old plan, which was a traditional pension plan that provided an annual pension based on a function of closing salary multiplied by the number of years of service, favored older workers because salaries increase with seniority. *Id*.  "Replacing a plan that discriminates against the young with one that is age-neutral does not discriminate against the old." *Id*.

With *Register v. PNC Fin. Servs. Group, Inc.*, the Third Circuit weighed in on the cash balance plan controversy. 477 F.3d 56 (3d Cir. 2007).  *Register* involved a claim by a group of plan participants that the PNC cash balance plan violated ERISA's anti-age discrimination provision because, under the plan, an employee's benefit accrual allegedly decreased because of age. *Register*, 477 F.3d at 61.  Appellants argued that "the term 'benefit accrual' refers to the employee's retirement benefit (the age-65 annuity), i.e. the output from the plan." *Id*. at 63-64. PNC argued that "'benefit accrual' refers to the employer's contributions in the form of credits to the hypothetical accounts, i.e. the inputs to the plan." *Id*. at 65.  "[A]ccording to PNC, because all participants receive the same interest credit, there is no discrimination against older participants and any increase in the value of the annuity results from the time value of money, not discrimination." *Id*.

Concluding that the term "benefit accrual" referred to the credits deposited into the participant's cash balance account, i.e. the inputs, the court stated that "'cash balance plans define the benefit in terms of a stated account balance,' not 'as a series of monthly payments for life to begin at retirement' like a traditional defined benefit plan." *Id*. at 68.

Like the Seventh Circuit in *Cooper*, the court compared the anti-discrimination

provisions applicable to defined benefit plans (29 U.S.C. § 1054(b)(1)(H)(i)) and defined

contribution plans (29 U.S.C. § 1054(b)(2)(A)).  Agreeing with the Seventh Circuit in *Cooper*,

the Third Circuit stated "[t]he provisions are nearly identical and prohibit the same behavior,

i.e., 'the employer can't stop making allocations (or accruals) to the plan or change their rate

on account of age.'" *Id.* (citing *Cooper*, 457 F.3d at 638).  Importantly, the court noted:

> The effect of the cash balance design that appellants challenge (the
> accumulation of interest) is identical to accumulation of interest on
> employer contributions under defined contribution plans.
> Accordingly, employer contributions in both instances ultimately are
> more valuable when those contributions are made to younger
> employees as the contributions have a longer time to grow. . .
> We do not find any support for appellants' argument that Congress
> wanted to prohibit such a consequence with respect to cash balance
> plans, but legitimize it for defined contribution plans.  Rather, the
> similarities of the anti-discrimination provisions governing defined
> benefit and defined contribution plans suggest that Congress was
> not seeking to prohibit the consequence of the time value of money
> in either circumstance.

*Register*, 477 F.3d at 69.

More recently, in *Drutis v. Rand McNally & Co.*, the Sixth Circuit Court of Appeals

followed the lead of *Cooper* and *Register* and rejected plaintiffs' contentions that cash balance

plans discriminated against older workers. *Drutis*, 499 F.3d 608, 615 (6th Cir. 2007).  The

court noted that plaintiffs' arguments treat the time value of money as age discrimination.

*Drutis*, 499 F.3d at 615.  Again, comparing the anti-discrimination provisions for defined-

benefit plans and defined-contribution plans, the court concluded "[i]nterest is not treated as

age discrimination for a defined-contribution plan, and the fact that these subsections are so

close in both function and expression implies that it should not be treated as discriminatory for

15

a defined-benefit plan either." *Id*.  The court agreed with the Seventh and Third Circuits "that the term 'benefit accrual' as used in § 1054(b)(1)(H)(i) refers to the employer's contribution [input] to the defined benefit plan." *Id*.  Because neither the contribution rate nor the interest rate change with age, the court concluded that the plan was not age discriminatory. *Id*.

This court agrees with the analysis of the three Circuit Courts that have confronted the issue and finds that Duke's Cash Balance Plan is not inherently age discriminatory under the terms of 29 U.S.C. § 1054(b)(1)(H)(i).  When interpreting a statute, the court must begin by examining the literal and plain language of the statute. *Markovski v. Gonzales*, 486 F.3d 108, 110 (4th Cir. 2007).  The court's inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent. *United States v. Hayes*, 482 F.3d 749, 752 (4th Cir. 2007).  An undefined term should be construed in accordance with its ordinary or natural meaning. *United States v. Mills*, 485 F.3d 219, 222 (4th Cir. 2007).  In determining the plain meaning, the court must consider the context in which the statutory words are used. *Ayes v. U.S. Dept. of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006).  The statute should be read as a whole and statutory phrases should not be construed in isolation. *Ayes*, 473 F.3d at 108.  "[C]ourts should disfavor interpretations of statutes that render language superfluous." *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 231 (4th Cir. 2007) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)).  "Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982).

This court finds that the phrase "rate of an employee's benefit accrual" was meant to refer to the employer's contributions to the plan (inputs), not the employee's actual retirement

16

benefits (outputs).  Cash balance plans are not defined in terms of an age 65 annuity, but are defined in terms of a hypothetical account balance that increases with the addition of pay credits and interest credits.  The rate of benefit accrual, therefore, is not determined by the change in the age 65 annuity, but by the annual change in the hypothetical account balance. *See Cooper*, 457 F.3d at 639.

It is unreasonable to conclude that the terms "benefit accrual" and "accrued benefit" can be used interchangeably.  In addition to prohibiting decreases in the <u>rate</u> of benefit accrual, § 1054(b)(1)(H)(i) provides that a defined benefit plan is impermissibly age discriminatory if "an employee's benefit accrual is ceased . . . because of the attainment of any age."  If benefit accrual actually means accrued benefit, as Plaintiffs suggest, the phrase which prohibits an employee's benefit accrual from ceasing on account of age makes no sense.  That is so because an accrued benefit is a benefit that has already accrued making it rightfully the property of the participant.  A benefit that has already accrued in favor of a participant cannot be ceased.

Under Duke's Cash Balance Plan, the pay credits and interest credits are applied to each employee's hypothetical cash balance account in an age neutral fashion.  Cash balance plans are not rendered discriminatory simply because younger employees have more time within which to accrue interest credits than older employees.  As stated by the Third, Sixth and Seventh Circuits, such is the result of the "time value of money."  Furthermore, there is simply no logical basis for the proposition that Congress would permit the effects of interest and the time value of money with regard to defined-contribution plans, but prohibit them with regard to defined-benefit plans. *See Register*, 477 F.3d at 68-69.  This conclusion is reinforced

17

by comparing the anti-discrimination provisions applicable to defined-contribution plans and defined-benefit plans.

Alternatively, Plaintiffs state that even if "rate of an employee's benefit accrual" refers to the inputs to the plan rather than the outputs of the plan, the Duke Cash Balance Plan remains age discriminatory because the employer's inputs (in the form of interest credits) cease directly on account of age. The Duke Cash Balance Plan states that "Interest Credits will be added to the cash balance account of each participant who has not commenced receiving Retirement Income." [1999 Plan § 5.04(a), Docket Entry #96-7] (emphasis added). The Plan also states that "[a] Participant who retires after his Normal Retirement Date may begin receiving Retirement Income under this provision for the month following his Postponed Retirement Date or for any month thereafter, provided that benefits must commence no later than April 1 following the year in which the Participant attains age 70 ½." *Id*. at § 6.03(b). Plaintiffs argue that these provisions, when read together, provide that a Participant's interest credits will cease based on the Participant having reached a certain age.

At the hearing on these motions, Duke explained that I.R.C. § 401(a)(9) required that benefit payments commence for retirees no later than April 1 following the calendar year in which the employee attains age 70 ½. [Transcript of December 19, 2007 Motions Hearing, at pgs. 6-9, 42-44, Docket Entry #180]. Duke argues that the Plan provision that requires benefits to commence for retirees no later than April 1 following the year in which the participant reaches age 70 ½ applies only to individuals who have retired before age 70 ½ and is not unlawful because it provides for exactly what the Internal Revenue Code requires. *Id*. at 8, 44. Duke notes that nothing in the Plan requires an individual to retire at a certain age and that as

18

long as an individual continues working he or she will continue to receive interest credits. *Id.* at 7. Duke also argues that ERISA's anti-age discrimination provision does not protect a retiree's rate of benefit accrual, but only protects an employee's rate of benefit accrual. *Id.* at 8, 44. Finally, Duke argues that Plaintiffs have no standing to bring a claim that interest credits improperly cease under the Plan after a participant reaches age 70 ½ because the complaint does not allege that these Plan provisions were ever applied to any named Plaintiff.

Title 26 U.S.C. § 401(a) states:

(a) Requirements for qualification.--A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section --

(1) if contributions are made to the trust by such employer, or employees, or both, or by another employer who is entitled to deduct his contributions under section 404(a)(3)(B) (relating to deduction for contributions to profit-sharing and stock bonus plans), or by a charitable remainder trust pursuant to a qualified gratuitous transfer (as defined in section 664(g)(1)), for the purpose of distributing to such employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with such plan;

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries (but this paragraph shall not be construed, in the case of a multiemployer plan, to prohibit the return of a contribution within 6 months after the plan administrator determines that the contribution was made by a mistake of fact or law (other than a mistake relating to whether the plan is described in section 401(a) or the trust which is part of such plan is exempt from taxation under section 501(a), or the return of any withdrawal liability payment determined to be an overpayment within 6 months of such determination);

19

(3) if the plan of which such trust is a part satisfies the requirements of section 410 (relating to minimum participation standards); and

(4) if the contributions or benefits provided under the plan do not discriminate in favor of highly compensated employees (within the meaning of section 414(q)). For purposes of this paragraph, there shall be excluded from consideration employees described in section 410(b)(3)(A) and (C) . . .

(9) *Required distributions*.--

(A) In general.--*A trust shall not constitute a qualified trust under this subsection unless the plan provides that the entire interest of each employee--*

(i) *will be distributed to such employee not later than the required beginning date*, or

(ii) will be distributed, beginning not later than the required beginning date, in accordance with regulations, over the life of such employee or over the lives of such employee and a designated beneficiary (or over a period not extending beyond the life expectancy of such employee or the life expectancy of such employee and a designated beneficiary) . . .

(C) *Required beginning date*.--For purposes of this paragraph--

(i) In general.--*The term "required beginning date" means April 1 of the calendar year following the later of--*

(I) *the calendar year in which the employee attains age 70 ½, or*

(II) *the calendar year in which the employee retires.*

26 U.S.C. § 401(a) (emphasis added).

Internal Revenue Code § 401(a)(9) sets forth "certain requirements for an employee

benefits plan to qualify for tax exemption under the Code." *Estate of Kelley v. Ochocinski*, No. 03-cv-723, 2005 WL 578163, at *5 (W.D.N.Y. March 9, 2005).  Section 401(a)(9) provides minimum distribution requirements for qualified pension plans and "limits use of pension funds as tax shelters beyond age 70 ½." *Lee v. California Butchers' Pension Trust Fund*, 154 F.3d 1075, 1081 (9th Cir. 1998).  "Failure to adhere to the minimum distribution requirements results in the imposition of a 50% excise tax on the amount by which the minimum required distribution exceeds the actual amount distributed during the taxable year." *In re Garner*, No. 04-13618C-7G, 2005 WL 1288335, at *3 (Bankr. M.D.N.C. April 29, 2005) (citing 26 U.S.C. § 4974(a)).

Under § 401(a)(9), a qualified pension plan must begin distributing the entire interest of the employee no later than the "required beginning date." 26 U.S.C. § 401(a)(9)(A)(i).  That section defines the "required beginning date" as the later of either: 1) April 1 following the calendar year in which the employee actually retires; or 2) April 1 following the calendar year in which the employee reaches age 70 ½. 26 U.S.C. § 401(a)(9)(C)(i)(I-II).

Section 5.04(a) of Duke's Cash Balance Plan is entitled "Interest Credits" and simply provides that interest credits will be added to the cash balance account of each Participant who has not begun receiving retirement income.  Section 6.03(b), under the heading "Postponed Retirement" and sub-heading "Commencement," contemplates a situation in which the employee retires after normal retirement age, 65, but before age 70 ½.  In such a case, I.R.C. § 401(a)(9) requires the Plan to begin distributing retirement income to the retired employee no later than April 1 following the year in which the employee attains age 70 ½.  Failure to do so could jeopardize the Plan's tax exempt status and/or subject the Plan to an excise tax of

21

50% of the difference between the amount actually distributed during the taxable year and the minimum required distribution. *See* 26 U.S.C. § 401(a)(9)(A); 26 U.S.C. § 4974.

Plaintiffs complain that §§ 5.04(a) and 6.03(b) of the 1999 Plan render the Plan unlawful because those sections mandate the cessation of interest credits upon the Participant having reached approximately 70 ½ years of age. Plaintiffs, however, have not attempted to explain how §§ 5.04(a) and 6.03(b) of the 1999 Plan could render the Plan unlawful when it appears that § 6.03(b) was written to ensure the Plan's compliance with the minimum distribution requirements of I.R.C. § 401(a)(9). Indeed, this conclusion is obvious when the language of I.R.C. § 401(a)(9) is compared with § 6.03(b) of the 1999 Plan.

Plaintiffs' claim, in essence, challenges the rate of benefit accrual for individuals who have retired and, by virtue of § 6.03(b) of the Plan, been "forced" to begin receiving retirement benefits at approximately age 70 ½, which under § 5.04(a) of the Plan results in the cessation of interest credits. Plaintiffs' claim fails because ERISA's anti-age discrimination provision prohibits decreases in or the cessation of the "rate of an *employee's* benefit accrual" because of the attainment of any age, not the rate of a *retiree's* benefit accrual or the rate of a *participant's* benefit accrual. 29 U.S.C. § 1054(b)(1)(H)(i).

As stated above, under § 1054(b)(1)(H)(i), a defined benefit plan is age discriminatory if "an *employee's* benefit accrual is ceased, or the rate of an *employee's* benefit accrual is reduced, because of the attainment of any age." *Id.* (emphasis added). ERISA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 1002(6). In contrast, "participant" means "any employee or former employee of an employer . . ." 29 U.S.C. § 1002(7). If Congress had intended to expand the anti-discrimination provision to protect

individuals who were former employees or retirees, they could have simply used the term "participant," rather than employee. Pursuant to the principles of statutory construction discussed above, Plaintiffs cannot force the term "participant" into ERISA's anti-age discrimination provisions. Because § 1054(b)(1)(H)(i) protects only an "employee's" rate of benefit accrual, Plaintiffs' claim challenging the cessation of interest credits for retired individuals who reach approximately age 70 ½ is dismissed.

In sum, Duke's motion for judgment on the pleadings is granted as to count one. Additionally, Duke's cross motion for partial summary judgment is granted and Plaintiffs' motion for partial summary judgment is denied.

C.    Count Two (ADEA)

Count two alleges claims under the ADEA for disparate treatment, 29 U.S.C. § 623(i), and disparate impact, 29 U.S.C. § 623(a)(2). Plaintiffs allege that Duke knowingly and willfully adopted a cash balance plan that discriminated against employees over the age of 40. Plaintiffs also allege that the implementation of the Plan, through use of the "greater of" formula discussed above, resulted in a "wear away" effect[11] of Plan benefits, which disparately impacted individuals over the age of 40. Plaintiffs contend that Duke knew or recklessly disregarded the fact that employees over the age of 40 would disproportionately suffer as a result of the conversion in that the conversion would effectively freeze benefit accruals for most employees over the age of 40. Plaintiffs seek an award of the lost benefit accruals resulting from the conversion as well as liquidated amounts based on such lost benefit

---

[11]    "Wear away" is a phenomenon unique to cash balance conversions in which a participant does not earn additional benefits until his hypothetical account balance catches up to or "wears away" the frozen accrued benefit under the old plan.

23

accruals.

Duke argues that count two should be dismissed because Plaintiffs have failed to state a claim under the ADEA. Plaintiffs argue that Duke's Cash Balance Plan gives rise to an ADEA claim under both "disparate treatment" and "disparate impact" analysis.

>    1.    Disparate Treatment

Duke contends that Plaintiffs have failed to state a claim of disparate treatment. Duke's argument in this regard is similar to its argument under count one. Indeed, at the hearing, Plaintiffs' counsel indicated that its disparate treatment ADEA claim, like Plaintiffs' ERISA age discrimination claim, also turned on the meaning of the phrase "rate of an employee's benefit accrual."

The ADEA utilizes language almost identical to ERISA's anti-age discrimination provisions. Specifically, 29 U.S.C. § 623(i)(1) provides:

> (1) Except as otherwise provided in this subsection, *it shall be unlawful for an employer, an employment agency, a labor organization, or any combination thereof to establish or maintain an employee pension benefit plan which requires or permits -*
>
> > (A) *in the case of a defined benefit plan, the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age*, or
> >
> > (B) in the case of a defined contribution plan, the cessation of allocations to an employee's account, or the reduction of the rate at which amounts are allocated to an employee's account, because of age.

Duke contends that 29 U.S.C. § 623(i), like 29 U.S.C. § 1054(b)(1)(H), bars discrimination with regard to the inputs to the benefit formula, not the output of the plan. Duke notes that 29 U.S.C. § 623(i) and 29 U.S.C. § 1054(b)(1)(H) were enacted as part of the

24

same act, the Omnibus Budget Reconciliation Act of 1986 ("OBRA").  The House Conference Report accompanying the OBRA provisions stated that the two provisions are to be interpreted in a consistent manner. H.R. Conf. Rep. No. 99-1012, at 378.

For the reasons discussed under count one, Plaintiffs' claim of disparate treatment under the ADEA fails.  The phrase "rate of an employee's benefit accrual," as it is used in 29 U.S.C. § 623(i), refers to inputs to the plan, rather than outputs.  Accordingly, Plaintiffs have failed to state a disparate treatment claim based on the allegation that younger employees have more time within which to accrue interest credits than older employees.  The economic effect of the time value of money does not amount to discrimination because of the attainment of any age.

### 2.    Disparate Impact - "Wear Away" Effect

Duke argues that Plaintiffs' disparate impact claim based on the "wear away" effect fails as a matter of law.  Duke contends that because 29 U.S.C. § 623(i) does not use the phrase "adversely affect," it does not permit disparate impact claims.  Duke relies on *Smith v. City of Jackson*, in which Justice Scalia wrote "the only provision of the ADEA that could conceivably be interpreted to" prohibit adverse impacts is § 623(a)(2). *Smith*, 544 U.S. 228, 246 (2005).  Duke argues that Plaintiffs cannot pursue their disparate impact claim under § 623(a)(2) because that section applies only to an employer's conduct that "limit[s], segregates or classif[ies] his employees in any way." 29 U.S.C. § 623(a)(2).  Duke submits that because the "greater of" formula is applied equally to all employees, it does not implicate the conduct governed by § 623(a)(2).  Furthermore, Duke argues that because § 623(i) is the sole ground for challenging allegedly discriminatory benefit accruals under the ADEA and § 623(i) does not

permit disparate impact claims, Plaintiffs' disparate impact claim fails as a matter of law.

In response, Plaintiffs argue that Duke misconstrues the *Smith* case and that the *Smith* case specifically holds that disparate impact claims were permitted under the ADEA.  This court agrees.  Plaintiffs' disparate impact claim is brought under 29 U.S.C. § 623(a)(2), which provides:

> It shall be unlawful for an employer:
>
>> to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

Plaintiffs' complaint states: "[t]he implementation of the Duke Energy Retirement Cash Balance Plan resulted in "wear away" as described above.  This, in turn, meant that long-term employees had benefit accruals frozen for several years.  The "wear away" effect disparately impacted employees over the age of 40." [Complaint, at ¶ 93, Docket Entry #1].

Plaintiffs' complaint sufficiently states an ADEA disparate impact claim based on the "wear away" effect suffered by employees over the age of 40.[12]  When asserting a claim of age discrimination under a disparate impact theory, "the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any

---

[12]        A prima facie case of age discrimination under a disparate impact theory in the cash balance plan conversion context requires: 1) identifying the specific employment practice being challenged; 2) demonstrating a significantly adverse or disproportionate impact on older employees; 3) offering statistical evidence sufficient to show the practice in question has caused the adverse employment action because of plaintiff's age. *Godinez v. CBS Corp.*, No. SA CV 01-28-GLT(ANX), 2002 WL 32155542, at *2 (C.D. Cal. May 20, 2002), *affirmed by*, 81 Fed. Appx. 949, 2003 WL 22803700 (9th Cir. Nov. 21, 2003) (unpublished).  "If an employee is able to make out a prima facie case, an employer may nevertheless defend the action by showing the challenged practice was based on legitimate business reasons." *Godinez*, 2002 WL 32155542, at *2.  "The employee may then show other alternative practices could serve the business identified by the employer without having a discriminatory effect." *Id.*

observed statistical disparities.'" *Smith*, 544 U.S. at 241.

Plaintiffs have identified the specific employment practice being challenged, i.e. Duke's conversion of its traditional pension plan to a cash balance plan and the "wear away" effect caused by the manner in which the conversion was implemented. Plaintiffs have alleged that employees over the age of 40 disproportionately suffer as a result of the wear away period because older employees must endure longer periods during which no additional benefits accrue. Accordingly, Plaintiffs have stated facts sufficient to allege an ADEA disparate impact claim based on the "wear away" effect that is plausible on its face.[13]

Duke's motion for judgment on the pleadings, with regard to count two, is granted in part and denied in part. Plaintiffs' ADEA disparate treatment claim under 29 U.S.C. § 623(i) is dismissed; Plaintiffs' ADEA disparate impact claim based on the "wear away" effect may proceed.

### D.    Count Three (Improper Lump Sum Calculation)

Count three alleges that Duke failed to properly calculate the lump sum distributions that participants are entitled to under the Plan.[14] Plaintiffs allege that Duke, rather than using the appropriate interest rate to reduce participants' retirement benefit to present value, used an interest rate that deprives participants of the full benefit promised under the Plan.

For defined benefit plans, a participant's "accrued benefit" means "the individual's

---

[13]     It should be noted that the Pension Plan Act of 2006 contains provisions that eliminate "wear away" periods. These provisions provide generally, that a participant's accrued benefit under the new cash balance plan cannot be less than the benefit accrued before the conversion <u>plus</u> any benefit accrued after the conversion. Of course, these provisions only apply to plans adopted after June 29, 2005.

[14]     Count three also includes a pre-retirement mortality discount claim that Plaintiffs have agreed to withdraw without prejudice provided discovery does not reveal that Duke used an improper mortality discount.

accrued benefit determined under the plan and, . . . expressed in the form of an *annual benefit commencing at normal retirement age*," i.e. an age 65 annuity. 29 U.S.C. § 1002(23)(A).  As an alternative to the age 65 annuity, plans may offer other forms of payment of the accrued benefit, including a lump sum payment.  The Plan at issue in this case offers a lump sum payment as an alternative to the age 65 annuity.

If a defined benefit plan offers a lump sum payment to the individual, the lump sum must be the actuarial equivalent of the individual's accrued benefit. 29 U.S.C. § 1054(c)(3). To determine the actuarial equivalent of the individual's accrued benefit, the accrued benefit must be projected to the individual's normal retirement age - 65, then reduced to present value. The key issue surrounding Plaintiffs' claim in count three is whether Duke used the appropriate interest rates in determining the actuarial equivalent of the participants' accrued benefit.  In other words, the issue is whether Duke used the appropriate interest rates to: 1) project the accrued benefit to normal retirement age; and 2) reduce the projection to present value.

Internal Revenue Code § 417(e) specifies the maximum interest rate that may be used to determine the actuarial equivalent of the accrued benefit and defines this interest rate as the "applicable interest rate."[15]  Because this interest rate is used to discount the future annuity payments to a present value amount (the lump sum), a higher interest rate produces a lower

_____

[15]      At the time of the events that occurred in this case, 26 U.S.C. § 417(e)(3)(A)(ii)(II) defined the applicable interest rate as the "annual rate of interest on 30-year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe." *Id*.  In 2006, § 417 was amended and now defines the "applicable interest rate" as "the adjusted first, second, and third segment rates applied under the rules similar to the rules of section 430(h)(2)(C) for the month before the date of the distribution or such other time as the Secretary may by regulations prescribe." 26 U.S.C. § 417(e)(3)(C).

lump sum for any given annuity. Thus, by defining the maximum interest rate, I.R.C. § 417(e) guarantees the minimum amount of the lump sum distribution that may be made in lieu of a participant's accrued benefit as stated in their hypothetical cash balance account. A plan may, by express plan provision, exceed this guaranteed minimum lump sum distribution by specifying an interest rate that is lower than the "applicable interest rate" set forth in § 417(e).

Plaintiffs allege that Duke, by the express terms of the Plan, was required to apply an interest rate <u>lower</u> than the "applicable interest rate" mandated by § 417(e). Plaintiffs allege that the January 1, 1999 Plan § 5.04(c) defines the interest rate to be used in the calculation of a lump sum as "the lesser of 4% or the 'applicable interest rate' specified in Code Section 417(e)." Plaintiffs contend that Plan § 5.04(c) required Duke to apply a 4% interest rate to reduce the age 65 annuity to present value. Plaintiffs allege that instead of using 4% to reduce the future annuity payments to present value, Duke used the "applicable interest rate" specified in § 417(e), which has been higher than 4% since the Plan's inception.

Accordingly, Plaintiffs allege that Duke, by virtue of the terms of the Plan, was required to perform a "whipsaw" calculation in computing the actuarial equivalent of the participants' accrued benefit. A whipsaw calculation occurs when the interest rate used to project a current account balance to normal retirement date or convert it to an annuity is <u>higher</u> than the interest rate used to discount the annuity back to present day value. *See* 26 U.S.C. § 411(a)(7)(A)(i); *West v. AK Steel Corp.*, 484 F.3d 395, 400-01 (6th Cir. 2007); *In re Citigroup Pension Plan ERISA Litigation*, 470 F. Supp. 2d 323, 334 (S.D.N.Y. 2006).

For example, consider the following hypothetical: 1) The plan's normal retirement age is 65; 2) the employee is age 64; 3) the employee's hypothetical account balance is $100,000;

4) the plan provides for an 8% interest rate to project to normal retirement age; and 5) the plan provides for a 6% rate to discount to present day value.  Under those facts, projecting the employee's account balance to normal retirement age - 65 - using an 8% interest rate would yield a sum of $108,000.  Using a 6% rate to discount $108,000 to present value yields a sum of $102,000, which is $2,000 more than the employee's hypothetical account balance. *See* American Academy of Actuaries, *What's Whipsaw? Why Is It a Problem?*, Issue Brief, (February 2003), *at* http://www.actuary.org/pdf/pension/whipsaw_feb03.pdf.    "The lump sum is whipsawed up and down." *Id*.  Therefore, if the plan's projection rate exceeds the [ ] discount rate, then the present value of the accrued benefit will exceed the participant's [hypothetical] account balance." *In re Citigroup*, 470 F. Supp. 2d at 334.  Under ERISA, 29 U.S.C. § 1053(a), and the Internal Revenue Code, 26 U.S.C. § 411(a)(2), an impermissible forfeiture results if the larger amount is not paid out. *Id*.  Under the facts of our example, if the employer does not pay the employee $102,000, but instead simply pays the employee the amount of his hypothetical account balance, $100,000, an impermissible forfeiture of $2,000 has occurred.

Plaintiffs allege that the interest rate used to convert a Duke cash balance account to an annuity under the 1999 Plan is defined in Appendix A as the "[a]nnual yield on 30-year United States Treasury securities for the month of November prior to the beginning of the Plan Year during which the Annuity Starting Date falls."  Plaintiffs further contend that § 5.04(c) of the 1999 Plan provides that the rate for discounting the lump sum distributions to present value is the lesser of 4% or I.R.C. § 417(e).  Thus, according to Plaintiffs, the projection interest rate is higher than the Plan's discount rate and therefore a whipsaw calculation is

30

required.

Plaintiffs argue that this claim is technical and factual and will require expert testimony as the case proceeds, as well as factual discovery to disclose how Duke applied the plan terms and performed calculations. Therefore, disposition under Rule 12 is premature.

Duke argues that count three should be dismissed because Plaintiffs have failed to allege improper calculations of lump-sum payments. Duke argues that Plaintiffs' claim in count three rests upon a mistaken understanding on § 5.04(c) of the Plan. Duke contends that § 5.04(c) specifies the interest *crediting* rate, not the present value *discount* rate. However, Plaintiffs maintain that § 5.04(c) could only apply to the discount rate because switching from the Treasury bond rate under Appendix A and Plan § 5.04(b) to a lower 4% interest rate for the "interest credit" benefit would constitute an illegal forfeiture. *See Berger v. Xerox Corp.*, 338 F.3d 755, 762-63 (7th Cir. 2003). In response, Duke states that § 5.04(c) applies only in limited situations which have never arisen. Duke asserts that § 5.04(c) only applies if the Treasury bond rate falls below 4%. In this circumstance, according to Duke, § 5.04(c) provides that the interest crediting rate used to project the value of the account forward is the same as the Treasury bond rate.

With regard to the proposition that § 5.04(c) provides for an illegal forfeiture, Duke argues first that: 1) the *Berger* decision was decided after the 1999 Plan took effect; 2) despite any illegality, the plain language of the provision cannot be ignored; and 3) because this provision was not applied to the Plaintiffs, they cannot claim any forfeitures.

Duke correctly notes that a whipsaw calculation is required only if a cash balance plan's interest crediting rate is higher than the present value discount rate. Duke maintains

that its Cash Balance Plan falls under a "safe harbor" provision, which provides that where a plan's interest crediting rate is no greater than the applicable interest rate under § 417(e)(3), a distribution equal to the employee's hypothetical account balance will satisfy ERISA. *See* IRS Notice 96-8.  Duke contends the Plan guarantees interest credits at the average yield on 30-year United States treasury bonds, and the 30-year Treasury bond rate is the present value discount rate specified by § 417(e).  Thus, no whipsaw calculation is required.  Put simply, Duke argues that because the projection rate and the present value discount rate are the same, any calculation projecting the participants' hypothetical account balance to normal retirement age, then reducing that amount to present day value, would yield a sum equal to the amount in the participants' hypothetical account.

Accepting Plaintiffs' allegations as true, however, Plaintiffs have stated a claim of improper lump sum calculations.  Section 5.04(c) of the 1999 Plan states:

> Notwithstanding anything herein to the contrary, if a Participant elects to receive a lump sum distribution prior to his Normal Retirement Date, the Monthly Interest Rate applied for purposes of determining the lump sum distribution shall be the lesser of 4% or the "applicable interest rate" specified in Code Section 417(e) and Treasury Regulation 1.417(e)-IT.

[1999 Plan, Docket Entry #96-7].  Appendix A of the 1999 plan states:

> 1.    For conversions of the Cash Balance Account to a single life annuity and to convert the Duke Power Prior Plan accrued benefit to a lump sum . . .
>
> Interest:    Annual yield on 30-year United States Treasury securities determined as the average for the month of November prior to the beginning of the Plan Year during which the Annuity Starting Date falls.

*Id*.

32

Plaintiffs interpret these provisions to require that Duke utilize the Treasury Bond rate to convert the cash balance account to a single life annuity and a 4% interest rate to reduce the single life annuity to present value. Additionally, according to Plaintiffs' interpretation, the use of the higher Treasury Bond rate to project the cash balance account to a single life annuity and the lower 4% rate to reduce the single life annuity to present value requires the use of a whipsaw calculation pursuant to 26 U.S.C. § 411(a)(7)(A)(i). Count three is indeed technical and will require expert and factual testimony for the court to sort through the parties' respective allegations with regard to their conflicting interpretations of § 5.04(c) and Appendix A of the 1999 Plan. Although Duke makes some strong arguments for dismissal, the court cannot weigh evidence or defer to Duke's interpretation of Plan provisions when ruling on a motion for judgment on the pleadings under Rule 12(c). Accordingly, Duke's motion for judgment on the pleadings with regard to count three is denied.

E.    Count Four (Improper Interest Rate Credit - 1997 and 1998 Plan Years)

Count four alleges that during the 1997 and 1998 Plan years, Duke failed to follow the procedure specified in the Plan for calculating the appropriate interest rate credit. Plaintiffs allege that as a result of this failure, participants who received lump sum distributions or monthly annuity payments did not receive the full amount they were entitled to under the Plan. Plaintiffs further allege that participants who have not yet retired will not receive the full amount of benefits they are entitled to unless the error in calculation is corrected and an appropriate amount credited to their "hypothetical" accounts. Specifically, Plaintiffs allege that Duke utilized provisions in the SPD description for calculating interest rate credits, rather than provisions in the Plan documents. Plaintiffs contend that if Duke used provisions in the Plan

33

documents, participants would have received the full benefits or interest credits to which they were entitled.

Plaintiffs seek a declaration that Duke erroneously calculated interest credits during 1997 and 1998 and that such error resulted in the wrongful denial of benefits to retirees. Plaintiffs request that Duke be required to restore any lost benefits resulting from their alleged erroneous calculation of interest credits.

Plaintiffs' claim is based on their interpretation of Plan provisions that describe how the interest factor will be calculated.  Based on Plaintiffs' interpretations, Duke understated benefits during plan years 1997 and 1998.  This issue turns on whether provisions in the Plan document control over provisions contained in the SPD.

Duke does not dispute Plaintiffs' interpretations of the Plan provisions; however, Duke maintains that count four should be dismissed because: 1) the Summary Plan Description controls over the Plan provisions; and 2) Plaintiffs have failed to exhaust their administrative remedies.[16]

Duke contends that it complied with the terms of the Summary Plan Description, which control over the terms of Plan document.  Duke argues that the Fourth Circuit has repeatedly held that "representations in a SPD control over inconsistent provisions in an official plan document." *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 648 n.13 (4th Cir. 2005). The SPD is "the statutorily established means of informing participants of the terms of the plan and its benefits," and the "employee's primary source of information regarding

---

[16]    With regard to Duke's failure to exhaust argument, Plaintiffs refer to their exhaustion arguments contained in their Reply brief to their Motion to Certify the Class.

employment benefits." *Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138, 140 (4th Cir. 1993)

(quoting *Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 27 (4th Cir. 1992)).   Accordingly,

"if there was a conflict between the complexities of the plan's language and the simple

language of the SPD, the latter would control." *Aiken*, 13 F.3d at 140.

However, Plaintiffs note that *Aiken* involved a plan participant who was trying to

enforce terms stated in the SPD.   The Fourth Circuit held that in order to secure relief

pursuant to the terms of the SPD, the ERISA claimant "must show some significant reliance

upon, *or* possible prejudice flowing from, the faulty plan description." *Id*. at 141.   Plaintiffs

argue that the rule as to conflicting SPDs and formal plan documents was generated by the

Courts as a means to protect employees from inaccurate summary plan descriptions.   In the

typical case, Plaintiffs contend, the SPD contains language more favorable to the employee,

and the company claims the formal plan controls.   In this case, "Duke tries to turn that rule on

its head to the detriment of employees, even though the SPD states that the plan controls in

cases where the two documents conflict." [Plaintiffs' Memorandum in Opposition to

Defendants' Motion for Judgment on the Pleadings, at pg. 49, Docket Entry #96].

Furthermore, Plaintiffs state that neither Duke nor the Plaintiffs allege they relied on the SPD

or were prejudiced.

Finally, Plaintiffs state that Duke's argument was expressly rejected by the Fourth

Circuit in *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 542-43 (4th Cir. 1992).   In *Glocker*,

the Court held that "where the handbook [or SPD] favors the employer, the employer cannot

disavow a disclaimer in the [SPD] representing that the Plan controls." *Id*. at 543.

In this case, Duke cannot rely on the terms of SPD to immunize itself from its own

practically admitted violations of the Plan documents. Duke does not dispute that it miscalculated interest rate credits during the 1997 and 1998 years. Rather, its sole arguments for dismissal of this count are that the SPD controls over the Plan documents and that Plaintiffs have failed to exhaust their administrative remedies. However, because Duke represented to its employees that the Plan document controls if a conflict arises between the Plan document and the SPD, Duke cannot repudiate this representation and rely on the terms of the SPD. *See Glocker*, 974 F.2d at 542. Duke's Reply argument misses the boat and misconstrues the "general rule" concerning conflicts between SPD terms and Plan terms. The "general rule" concerning conflicts between SPD terms and Plan terms was meant to protect employees who rely on SPD terms, not employers.

Duke also argues that count four should be dismissed because Plaintiffs have failed to exhaust their administrative remedies. Plaintiffs have alleged in their complaint that Plaintiffs exhausted their administrative remedies under the Plan prior to initiating this action. [Complaint, at ¶ 7, Docket Entry #1]. Plaintiffs state that they received written notification, dated June 7, 2005, of a final denial of Plaintiffs' administrative appeals. Plaintiffs alternatively claim that they qualify for either of two exceptions to exhaustion: 1) wrongful denial of meaningful access; or 2) futility.

Although ERISA does not contain an explicit exhaustion provision, generally an ERISA claimant is required to exhaust the remedies provided by the employee benefit plan as a prerequisite to an ERISA claim for benefits under 29 U.S.C. § 1132. *Makar v. Health Care Corp. of Mid-Atlantic (Carefirst)*, 872 F.2d 80, 82 (4th Cir. 1989). Exhaustion of administrative remedies may be excused if: 1) it appears that exhaustion would have been

36

futile; or 2) it appears that the plaintiff would have been denied meaningful access to established internal procedures. *Vogel v. Independence Fed. Sav. Bank*, 728 F. Supp. 1210, 1223 (D.Md. 1990). The question of whether exhaustion of administrative remedies is required in a particular ERISA case is a matter within the discretion of the trial court. *Vogel*, 728 F. Supp. at 1223; *see also Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131, 138 (7th Cir. 1997).

The court finds that, through Plaintiff Freeman's administrative appeal, Plaintiffs have exhausted their administrative remedies with regard to their claim that Duke used improper interest rate credits for the 1997 and 1998 plan years.

In a letter dated October 28, 2004, Plaintiffs' counsel wrote to Duke raising five issues. Generally, the first issue, which is the only issue that could be construed to raise the interest rate credit issue, concerned Duke's calculation of Plaintiff Freeman's early retirement lump sum benefit. Plaintiffs' counsel requested information regarding the components of the calculation of Freeman's lump-sum payment, including the calculation of opening account balances, the contribution credits for each quarter from January 1, 1997 through the date of early retirement (End Date), interest credits for each quarter from January 1, 1997 through the End Date, the hypothetical account balance as of the End Date, and actuarial factors used to convert the hypothetical account balance to a lump sum payment.

Duke responded on November 30, 2004, noting that with regard to Freeman's request for information concerning interest rate credits, Freeman had received quarterly statements detailing pay and interest credits to his Plan account. Duke also stated that although the requested information was readily retrievable for the preceding two years, the information was

not retrievable from January 1, 1997 without significant effort and expense.

On December 22, 2004, Duke issued a formal denial of Freeman's claims stating that "[w]hile it is not entirely clear what relief Mr. Freeman seeks, it appears that he seeks to have his benefit under the Plan recalculated . . . that claim is denied." [Administrative Claims, Docket Entry #93-3, at 46].

On February 18, 2005, Freeman appealed the December 22, 2004 denial of his claim to the Plan Claims Committee.  On June 7, 2005, the Plan Claims Committee denied Freeman's appeal.

Although the issue was raised in the context of a challenge to the way Freeman's lump sum benefit was calculated, Freeman adequately raised issues concerning the interest rate credit for 1997 and 1998.  Nevertheless, Duke contends that Plaintiffs did not exhaust their administrative remedies because no Plaintiff made a specific claim that Duke had miscalculated interest rate credits for 1997 and 1998.  Duke argues that a request for information regarding how the lump-sum distribution was calculated is not a claim for benefits based on allegedly improper dates for valuation of interest crediting rates.

However, in its December 22, 2004 denial letter Duke acknowledged that the relief Freeman sought was a recalculation of his benefit under the Plan.  Duke denied Freeman's claim and indicated that it would not recalculate Freeman's benefit under the Plan.  Based on the position taken during the administrative claims process, Duke appeared to be unwilling to take even the first step to correct what Freeman perceived as a problem with the calculation of his lump sum benefit.  An argument could be made that a recalculation of Freeman's benefit under the Plan may have revealed the alleged problem with the 1997 and 1998 interest rate

credits.[17]

Even if Freeman did not adequately raise the issue of improper interest rate credits for the 1997 and 1998 Plan years, Duke's apparent failure to thoroughly review Freeman's claim and unwillingness to recalculate Freeman's benefits under the plan indicates that further exhaustion of this claim would be futile. Also, Duke's refusal to provide the requested information regarding the interest rate credits that were applied to participants' accounts during the 1997 and 1998 Plan years on the basis that the retrieval of such information would require "significant effort and cost" is further evidence that exhaustion would have been futile.

In summary, the court finds that Plaintiffs adequately exhausted their administrative remedies with regard to count four. However, even if Plaintiffs could have pursued additional administrative remedies concerning their claim of improper interest rate credits, this court concludes in its discretion that exhaustion would have been futile in this case.

Because count four alleges facts sufficient to state a claim to relief that is plausible on its face, Duke's motion for judgment on the pleadings is denied with respect to count four of the complaint.

F.    Count Five (Backloading)

Count five alleges that the implementation of the Cash Balance Plan resulted in an impermissible backloading of benefits. ERISA's anti-backloading provision states that a defined benefit plan does not violate the anti-backloading provision if:

---

[17]    Even though Freeman's lump sum benefit was the present value of Freeman's frozen accrued benefit under the previous Duke Plan and the interest rate credit issue concerned Freeman's hypothetical account balance, to the extent that Freeman was permitted to choose the "greater of" his frozen accrued benefit under the old plan or the amount of his hypothetical cash balance account, a recalculation of Freeman's benefits under the Plan may have revealed the alleged errors involving the interest rate credit.

> under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133⅓ percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

29 U.S.C. § 1054(b)(1)(B). This section of ERISA "requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any previous year by more than 33%." *Register*, 477 F.3d at 71. "The purpose of the anti-backloading provision is to prevent an employer from avoiding the vesting requirements through minimal accrual of benefits in early years of employment, followed by larger benefit accruals as an employee nears retirement." *Id.* (internal quotations omitted).

According to Plaintiffs, the Plan used an approximate 7 percent interest rate to calculate the present value of accrued benefits under the prior Duke plan. Plaintiffs allege that because accruals under the Cash Balance Plan were based on a lower interest rate, the present value of accrued benefits under the prior plan was substantially greater than the accrued benefits under the cash balance formula. Plaintiffs allege that under the Cash Balance Plan participants do not accrue any additional benefits until the value of their hypothetical cash balance account exceeds the present value of accrued benefits under the prior plan. Thus, Plaintiffs contend that the manner in which Duke implemented the Cash Balance Plan effectively froze accrual rates for employees with long-term service in violation of 29 U.S.C. § 1054(b). Plaintiffs' backloading claim is based on the "wear-away" effect. Simply stated, because "wear-away" causes employees to cease benefit accruals for a period of time, once the "wear-away" period

40

ends, the new accruals exceed the maximum annual increase in the rate of benefit accrual permitted by the 133⅓ percent rule.

Plaintiffs seek a declaration that Duke backloaded accruals in violation of § 1054(b)(1) and (2). Plaintiffs also request that Duke be required to restore any lost benefits resulting from Duke's alleged unlawful backloading of benefits and that Duke be ordered to retroactively reform the Plan so that it complies with § 1054(b)(1).

Duke argues count five should be dismissed because Plaintiffs have failed to allege a cognizable backloading violation. Specifically, Duke argues that Plaintiffs' anti-backloading claim fails as a matter of law because, as the Third Circuit explained in *Register*, a backloading violation cannot be based on "wear-away."

ERISA's anti-backloading provision states that "[f]or the purposes of this subparagraph . . . any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." 29 U.S.C. § 1054(b)(1)(B)(i). Therefore, "once there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the 133 ⅓% test." *Register*, 477 F.3d at 72. Accordingly, Duke argues that count five should be dismissed.

Plaintiffs rely on Treasury Regulation 1.411(b)-1 for the proposition that higher accruals in previous years cannot be averaged with lower or non-existent rates in intermediate years to avoid a violation. 26 C.F.R. § 1.411(b)-1(b)(2)(iii)(Example 3). Citing § 1.411(b)-1(a), Plaintiffs contend that when benefits are determined under more than one plan formula, they must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfies ERISA's anti-backloading provisions. Plaintiffs urge the court to

41

adopt the IRS and Treasury Department's interpretation of the anti-backloading rules. Plaintiffs note that the IRS interprets 26 C.F.R. § 1.411(b)-1 and ERISA's anti-backloading rules to invalidate use of "greater of" formulas. However, a recent IRS revenue ruling reflects a change in the earlier approach taken by the IRS and concludes that "wear away" cannot serve as the basis for a backloading violation. Rev. Rul. 2008-7, at 12.

In *Register*, the Third Circuit considered a backloading claim with reference to the Treasury Regulations that Plaintiffs cite. *See Register*, 477 F.3d at 72. The Third Circuit held that § 1.411(b)-1(a) only applies in cases where there are two co-existing formulas under a single plan. *Id*. The Third Circuit relied on the ERISA anti-backloading provision which states "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." *Id*. (citing 29 U.S.C. § 1054(b)(1)(B)(i)). The Third Circuit reasoned that the plaintiff had failed to state a claim because the rate at which benefits accrued in the hypothetical cash balance account, when viewed in isolation as required by § 1054(b)(1)(B)(i), did not violate the anti-backloading rule. *Id*.

In the instant case, the rate of benefit accrual under Duke's Cash Balance Plan does not violate ERISA's anti-backloading rule. The Treasury Regulations cited by the Plaintiffs only apply to cases involving multiple formulas under the same plan. Because the rate of benefit accrual under Duke's Cash Balance Plan is the result of a plan amendment, the only relevant formula for purposes of the anti-backloading rule is the Cash Balance Plan formula. Considering only the formula used by the Cash Balance Plan, the Cash Balance Plan does not violate ERISA's anti-backloading rule. Therefore, because Plaintiffs have failed to state a

claim for violations of ERISA's anti-backloading rule,[18] count five of Plaintiffs' complaint is dismissed.

G.    Count Six (Breach of Fiduciary Duty - 29 U.S.C. § 1132(a)(3)

Count six, brought under 29 U.S.C. § 1132(a)(3), alleges Duke breached its fiduciary duties owed under ERISA.  As noted above, Plaintiffs filed a motion to amend the scheduling order and the complaint to add a seventh cause of action and additional factual allegations to their breach of fiduciary duty cause of action.  Duke opposes the addition of a seventh cause of action, but does not oppose the addition of new factual allegations to the existing breach of fiduciary duty cause of action.  Therefore, for purposes of this discussion, the court will consider Plaintiffs' breach of fiduciary duty cause of action as it is pled in the amended complaint.

In their amended complaint, Plaintiffs allege that Duke breached its fiduciary duties by misleading employees about the effects of the conversion to the Cash Balance Plan and the purpose behind certain amendments to the Plan concerning the calculation of interest credits. Plaintiffs allege that Duke and/or its designee breached its fiduciary duties by committing numerous errors in the calculation of opening account balances and/or the calculation of interest credits.  Plaintiffs further allege that Duke breached the standards of care in the

---

[18]    *Accord Register*, 477 F.3d at 72; *Richards v. FleetBoston Fin. Corp.*, 427 F. Supp. 2d 150, 170-71 (D.Conn. 2006) (applying § 1054(b)(1)(B)(i) and concluding employees suffer no backloading of benefits); *Richards v. FleetBoston Fin. Corp.*, No. 3:04-cv-1638(JCH), 2006 WL 2092086, at *3 (D.Conn. July 24, 2006) (reconsidering 427 F. Supp. 2d 150 after opportunity for briefing on the issue by plaintiff; refusing to ignore the clear language of 29 U.S.C. § 1054(b)(1)(B)(i)); *Wheeler v. Pension Value Plan for Employees of Boeing*, No. 06-cv-500-DRH, 2007 WL 2608875, at *16 (S.D.Ill. Sept. 6, 2007) (rejecting plaintiffs' anti-backloading claim and concluding that the IRS' interpretation of 26 C.F.R. § 1.411(b)-1 is not entitled to deference by the Court); *Allen v. Honeywell Retirement Earnings Plan*, 382 F. Supp. 2d 1139, 1160 (D.Ariz. 2005) (concluding that "in determining whether a new benefit formula violates the 133⅓ percent rule, one does not compare the new formula with the old formula; rather, the backloading question must be answered by considering the new formula on a stand-alone basis).

manner it administered the Cash Balance Plan by arbitrarily adjusting opening account balances for numerous employees in attempts to circumvent the notice requirements of 29 U.S.C. § 1054(h). Plaintiffs contend that because Duke arbitrarily adjusted opening account balances, participants' benefits are not definitely determinable as required by 26 U.S.C. § 401(a)(25). Plaintiffs also state that Duke failed to inform participants of the alleged arbitrary adjustments and the reasons for the arbitrary adjustments. Finally, Plaintiffs allege that Duke breached its duty of reasonable care when it allowed the Cash Balance Plan to operate in violation of ERISA and failed to correct, among other things, the problems related to lump sum distributions, backloading of benefits, and aged based benefit accruals.

Plaintiffs request that Duke be required to reform the Cash Balance Plan so that it is in compliance with the applicable laws. Plaintiffs further request that Duke be required to recalculate participants/beneficiaries' benefits under the revised and reformed Plan and pay restitution to the Plan participants. Additionally, Plaintiffs seek the appointment of an independent auditor to review the Cash Balance Plan and all cash balance accounts.

Duke argues that count six should be dismissed because Plaintiffs have failed to state any cognizable claim for relief under count six.

Duke argues that Plaintiffs' breach of fiduciary duty claim consists of three distinct claims: 1) that Duke allegedly misled employees regarding the purpose and effects of the conversion to the Cash Balance Plan; 2) that Duke allegedly committed numerous errors in the administration of the Cash Balance Plan, specifically in the calculation of opening account balances and interest credits (failure to comply with plan terms); and 3) that Duke permitted the Plan to (a) violate IRS "whipsaw" standards with regard to lump sum distributions; and (b)

operate in violation of ERISA's age discrimination and anti-backloading rules (failure to comply with ERISA). Plaintiffs do not dispute Duke's characterization of their breach of fiduciary duty claim and, generally, the court agrees with Duke's characterization. However, with the addition of new factual allegations in their amended complaint, Plaintiffs' breach of fiduciary duty cause of action now, in the court's view, contains a fourth distinct claim - that Duke breached the standards of care in the manner that they administered the Plan by arbitrarily adjusting the opening account balances of selected employees in attempts to avoid ERISA's notice requirements under 29 U.S.C. § 1054(h) and that, as a result, participants' benefits are not definitely determinable as required under 26 U.S.C. § 401(a)(25).

        1.    <u>Breach of Fiduciary Duty - Misrepresentation</u>

On Plaintiffs' misrepresentation claim, Duke argues that Plaintiffs have failed to allege detrimental reliance. Additionally, Duke argues that ERISA does not authorize the relief sought by the Plaintiffs.

Although Plaintiffs' initial complaint simply alleges that Duke misled employees about the effects of the conversion, in their response to Duke's motion for judgment on the pleadings, Plaintiffs frame their "misrepresentation" breach of fiduciary duty claim as a claim based on Duke's alleged failure to send notice of the planned cash balance conversion in violation of 29 U.S.C. § 1054(h). Duke does not appear to oppose this development even though Duke has objected to Plaintiffs' motion to amend the scheduling order and complaint to add a seventh cause of action based on the alleged failure to provide § 1054(h) notice.

ERISA requires the plan administrator to provide at least 15 days written notice to plan participants of plan amendments that will result in a significant reduction in benefit accruals.

45

29 U.S.C. § 1054(h).  In their brief, Plaintiffs allege that plan participants were not provided adequate notice pursuant to § 1054(h).

ERISA's fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, are derived from certain principles of the common law of trusts. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989).  Under ERISA, fiduciaries may not make material misrepresentations to beneficiaries, or provide incomplete, inconsistent, or contradictory disclosures that misinform beneficiaries. *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001).  Additionally, a fiduciary is obligated to affirmatively provide "material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know and which the beneficiary needs to know for his protection. *Griggs*, 237 F.3d at 380.  "In sum, the duty to inform 'entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" *Id.* (citing *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)).

Duke argues that "to prove an ERISA breach of fiduciary duty based on a misrepresentation, a plaintiff must establish each of the following elements: '(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation.'" *Wiseman v. First Citizens Bank & Trust Co.*, 215 F.R.D. 507, 510 (W.D.N.C. 2003).

Duke maintains that instead of alleging detrimental reliance, Plaintiffs simply allege that they were prejudiced by the conversion because it upset expectations they had developed before

46

the cash balance plan was created.[19]

Relying upon *Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138, 141 (4th Cir. 1993), Plaintiffs argue that under the facts of this case they need only show reliance *or* prejudice. Plaintiffs state that Duke employees were prejudiced by the plan conversion because they had put in years of work based on the company's promises related to retirement benefits and then were dealt a benefit cut once they were too old to take corrective action to protect themselves.

Duke responds arguing that *Aiken* involved a claim for benefits under an SPD, not a fiduciary duty claim. Duke notes that *Elmore v. Cone Mills Corporation* addresses fiduciary duty claims and requires reliance. 23 F.3d 855, 836 n.* (4th Cir. 1994).

Alternatively, Duke argues that even if the "likely prejudice" standard applies, Plaintiffs have not alleged that they were prejudiced by Duke's disclosures, but by the plan conversion. Duke submits that a claim that a plan amendment upset plaintiffs' expectations is not a challenge to fiduciary disclosures concerning the amendment, but an attack on the settlor act of amending a plan.

However, Plaintiffs' claim is not simply that the plan conversion upset their expectations, but that Duke failed to provide adequate notice of the conversion pursuant to § 1054(h). Plaintiffs allege they were prejudiced as a result of the nondisclosure of the plan conversion, not simply the plan conversion itself. Plaintiffs maintain they suffered prejudice because they were not able to take sufficient action to protect themselves against the effects of

---

[19]    Plaintiffs have withdrawn their request for class certification of their breach of fiduciary duty claim based on misrepresentation. Plaintiffs did, however, indicate that they intended to proceed with that claim on an individual basis. [Plaintiffs' Reply Memorandum in Support of Motion for Class Certification, at pg. 18, Docket Entry #93].

the conversion.

This court disagrees with Duke's assertion that Plaintiffs' mere failure to mention the term "detrimental reliance" in their complaint, as opposed to prejudice, requires dismissal of Plaintiffs' claim under Rule 12(c).  Under *Twombly*, 127 S.Ct. at 1965, and the dictates of notice pleading, Plaintiffs have sufficiently alleged detrimental reliance *and* prejudice.[20]  In paragraph 52 of their complaint, Plaintiffs state:

> Duke's conversion to a Cash Balance Plan during the late 1990s, which was intended to and did cut benefits, prejudiced many of its older workers because these employees had put in years of working for a company based on Duke's promises that they were going to get a retirement pension at one amount, and suddenly the amount was greatly cut.  Cash balance conversions left older workers stranded, too old to start their careers over again, and having to defer plans for early retirement, because their expected lump sum benefit had been slashed.

[Complaint, at ¶ 52, Docket Entry #1].  This court believes that paragraph 52 of Plaintiffs' complaint sufficiently alleges both detrimental reliance and prejudice.

### 2.     Breach of Fiduciary Duty - Failure to Comply with Plan Terms

It appears from Plaintiffs' amended complaint that Plaintiffs' failure to comply with Plan terms claim is premised on: 1) the allegation that Duke used an improper interest rate credit for the 1997 and 1998 Plan years; and 2) the allegation that commissions were not included in participants' compensation for the purposes of calculating opening account balances. *See* [Proposed Amended Complaint, at ¶¶ 64-76, Docket Entry #116-2].

Duke argues that Plaintiffs' claim is actually an unexhausted claim for benefits.

---

[20]     At this stage, the court need not determine whether detrimental reliance (as Duke argues) or likely prejudice (as Plaintiffs argue) is the appropriate standard because the court finds that Plaintiffs have sufficiently alleged detrimental reliance and prejudice in their complaint.

48

Plaintiffs respond that they have in fact exhausted their administrative remedies or, in the alternative, exhaustion should be waived.  Exhaustion aside, Plaintiffs do not address the issue that their breach of fiduciary duty claim based on failure to comply with Plan terms is actually a claim for benefits.

"[A] claim for breach of fiduciary duty is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of *an ERISA-regulated plan* rather than upon an interpretation and application of *ERISA*." *Smith v. Sydnor*, 184 F.3d 356, 362 (4th Cir. 1999).  Plaintiffs' breach of fiduciary duty claim based on failure to comply with Plan terms alleges that Duke violated the terms of the Plan in its calculation of interest credits and opening account balances.  Thus, resolution of whether Duke violated the terms of the Plan will necessarily rest upon an interpretation and application of the Plan rather than an interpretation and application of ERISA.  Accordingly, Plaintiffs' claim that Duke failed to comply with the terms of the Plan is actually a claim for benefits under 29 U.S.C. § 1132(a)(1)(B).

In *Korotynska v. Metropolitan Life Ins. Co.*, the Fourth Circuit held that when § 1132(a)(1)(B) affords the plaintiff adequate relief, a cause of action for breach of fiduciary duty under § 1132(a)(3) is not appropriate. *Korotynska*, 474 F.3d 101, 107 (4th Cir. 2006); *see also Edmonds v. Hughes Aircraft Co.*, 145 F.3d 1324, No. 97-1431, 1998 WL 228200, at *10 (4th Cir. May 8, 1998) (noting that the Supreme Court in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), did not intend to create an additional cause of action for every beneficiary challenging a denial of benefits by his plan's fiduciary); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998) (stating that because plaintiff had adequate relief under § 1132(a)(1), relief

through the application of § 1132(a)(3) would be inappropriate).  The Fourth Circuit stated that:

> Although the Second Circuit has held that plaintiffs may seek relief simultaneously under § 1132(a)(1)(B) and § 1132(a)(3), the great majority of circuit courts have interpreted *Varity* to hold that a claimant whose injury creates a cause of action under § 1132(a)(1)(B) may not proceed with a claim under § 1132(a)(3).  These courts have not allowed claimants to proceed with § 1132(a)(3) claims where relief was <u>potentially available to them</u> under § 1132(a)(1)(B), because, in *Varity*, "[t]he Supreme Court clearly limited the applicability of § 1132(a)(3) to beneficiaries who may not avail themselves of § 1132's other remedies."

*Korotynska*, 474 F.3d at 106-7 (emphasis added) (internal citations omitted).

Plaintiffs' allegation that Duke violated Plan terms by utilizing an improper interest rate credit for the 1997 and 1998 Plan years is currently being pursued simultaneously as a § 1132(a)(1)(B) claim for benefits under count four and a § 1132(a)(3) breach of fiduciary duty claim under count six.  Plaintiffs have simply recast their claim for benefits under count four as a claim for breach of fiduciary duty under count six.  However, the law in the Fourth Circuit is clear that such alternative pleading is not permitted under ERISA when Plaintiffs have an adequate remedy under § 1132(a)(1)(B).

Although Plaintiffs' challenge to the opening account balances on the basis that commissions were not included in the compensation for purposes of calculating opening account balances is not being pursued simultaneously under another count in the complaint, Plaintiffs' challenge is really a claim for benefits that should be pursued under 29 U.S.C. § 1132(a)(1)(B).  To allow a claim under § 1132(a)(3) under these circumstances would permit Plaintiffs to avoid the implications of § 1132(a)(1)(B) by simply re-characterizing their claim

for benefits as a breach of fiduciary duty claim, a result which the Supreme Court has expressly rejected.[21] *See Korotynska*, 474 F.3d at 107-08.

Because Plaintiffs have an adequate remedy under 29 U.S.C. § 1132(a)(1)(B) for Duke's alleged failure to comply with the terms of the Plan, Plaintiffs' breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(3) based on noncompliance with Plan terms is not appropriate and is dismissed. *See Korotynska*, 474 F.3d at 107.

### 3.    Breach of Fiduciary Duty - Failure to Comply with ERISA

With regard to Plaintiffs' claim that Duke allowed the Plan to violate IRS "whipsaw" standards and ERISA's age discrimination and anti-backloading rules, Duke asserts that Plaintiffs' claim is an impermissible attack on settlor conduct.

"Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996).  When employers adopt, modify, or terminate welfare plans, they do not act as fiduciaries; their actions are analogous to settlors of a trust. *Lockheed Corp.*, 517 U.S. at 890.  Duke argues that Plaintiffs' breach of fiduciary duty claim based on the design and adoption of an allegedly illegal Cash Balance Plan should be dismissed because when Duke designed and adopted the Cash Balance Plan it

---

[21]    Having reviewed Plaintiffs' submissions relevant to the exhaustion issue, this court believes that Plaintiffs have not exhausted their administrative remedies with regard to their claim that Duke failed to include commissions in participants' compensation for purposes of calculating opening account balances. *See* [Docket Entry #93-3].  Plaintiff Moyers raised the issue and obtained a favorable result from the Benefits Department. [Docket Entry #93-3, at pg. 22-24].  The Benefits Department reviewed Moyers' claim and found that $8,925 in commission income was erroneously excluded from Moyers' compensation in 1992.  After recalculating Moyers' opening account balance with the inclusion of the $8,925, the Benefits Department increased Moyers' opening account balance by $8,443.  Moyers did not appeal the decision of the Benefits Department to the Plan Claims Committee.

Additionally, given the favorable disposition of Moyers' administrative claim and Duke's willingness to thoroughly review Moyers' claim and recalculate his benefit under the Plan, the court does not believe that exhaustion of this claim by similiarly situated claimants would be futile.

51

was not acting as a fiduciary.

Plaintiffs essentially concede the point that their breach of fiduciary duty claim based on the design and adoption of an allegedly illegal plan goes toward settlor conduct. Plaintiffs argue that their breach of fiduciary duty claim is not wholly based on plan design but on lack of adherence to plan terms. Plaintiffs point out, for example, that Duke failed to adhere to the terms of the plan when it incorrectly calculated interest. However, for the reasons discussed above, Plaintiffs' breach of fiduciary duty claim based on noncompliance with plan terms is actually a claim for benefits that, because Plaintiffs have another adequate remedy under § 1132(a)(1)(B), may not be brought as a breach of fiduciary duty claim under § 1132(a)(3).

Because Plaintiffs concede the point that their breach of fiduciary duty claim based on Duke's design and adoption of the allegedly illegal Cash Balance Plan involves settlor-type conduct rather than fiduciary conduct, Plaintiffs' breach of fiduciary duty claim under that theory (failure to comply with ERISA) is dismissed.

4.   <u>Breach of Fiduciary Duty - Arbitrary Adjustments to Opening Account Balances</u>

Plaintiffs alleged in their amended complaint that Duke breached standards of care in the manner that they have administered the Plan by arbitrarily adjusting opening account balances in attempts to circumvent ERISA's § 1054(h) notice requirements. Plaintiffs also contend that Duke failed to inform employees of the adjustments or the reasons for making such adjustments. Plaintiffs state that as a result of Duke's discretionary alteration of account balances, participants' benefits under the Plan are not definitely determinable as required by 26 U.S.C. § 401(a)(25).

The court notes that this new sub-specification of Plaintiffs' breach of fiduciary duty cause of action was alleged in the amended complaint to which Duke has not yet filed any dispositive motions.  At first glance, this allegation appears to be a proper breach of fiduciary duty claim.

### 5.     Relief Requested under Breach of Fiduciary Duty Claims

Plaintiffs brought their breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(3).  Section 1132(a)(3) authorizes only "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Rego v. Westvaco Corp.*, 319 F.3d 140, 145 (4th Cir. 2003). Under their breach of fiduciary duty claim, Plaintiffs request: 1) an injunction retroactively reforming the Plan so that it complies with ERISA; 2) restitution; and 3) appointment of an auditor to review all cash balance accounts.

As explained above, Plaintiffs' breach of fiduciary duty claims based on Duke's alleged failure to comply with Plan terms and ERISA's "whipsaw" standards, anti-age discrimination and anti-backloading rules fail.  The only surviving claims under count six of the complaint/amended complaint are Plaintiffs' breach of fiduciary duty claims based on: 1) Duke's alleged misrepresentation concerning the effects of the cash balance conversion; and 2) Duke's alleged arbitrary adjustments to opening account balances.  However, with regard to the relief requested, Duke argues that Plaintiffs cannot recover restitution for their breach of fiduciary duty claim based on an alleged misrepresentation concerning the effects of the cash balance conversion because such constitutes an impermissible claim for compensatory damages.

In *LaRue v. DeWolff, Boberg & Assocs., Inc.*, the Fourth Circuit concluded that "ERISA

53

does not permit plan beneficiaries to claim money damages from plan fiduciaries." 450 F.3d 570, 577 (4th Cir. 2006), *vacated on other grounds*, 128 S.Ct. 1020 (2008) (holding that "although § [1132](a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account").  The plaintiff in *LaRue* brought a breach of fiduciary duty claim for restitution under 29 U.S.C. §§ 1132(a)(2) and (a)(3).  The Fourth Circuit stated that, in the absence of unjust enrichment, unlawful possession or self dealing on the employer's part, a breach of fiduciary duty claim for equitable restitution under § 1132(a)(3) constituted an impermissible claim for compensatory damages. *LaRue*, 450 F.3d at 575-76.  The Court denied the plaintiff's breach of fiduciary duty claim for restitution under § 1132(a)(3) because the plaintiff "gauge[d] his recovery not by the value of defendants' nonexistent gain, but by the value of his own loss - a measure that is traditionally legal, not equitable." *Id*. at 576.  Thus, the plaintiff sought "to obtain a judgment imposing a merely personal liability upon the defendant[s] to pay a sum of money" and such claims are unavailable under § 1132(a)(3). *Id*.

This court finds that under the circumstances alleged, Plaintiffs' cannot recover restitution for their breach of fiduciary duty claim based on misrepresentation concerning the effects of the plan conversion.  To prevail on a breach of fiduciary duty claim for equitable restitution, the plaintiff "must argue that 'money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.'" *Rego*, 319 F.3d at 145 (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)).  Plaintiffs' damages for this claim are not measured by

54

any unlawful gain of Duke, but by the losses allegedly sustained by the Plaintiffs. Plaintiffs, therefore, gauge their recovery not by the value of Duke's nonexistent gain, but by the value of their own losses. Plaintiffs do not allege that Duke was unjustly enriched as a result of Duke's alleged failure to provide adequate notice. More importantly, Plaintiffs cannot establish that "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *See Rego*, 319 F.3d at 145. Accordingly, Plaintiffs cannot recover restitution under their "misrepresentation" breach of fiduciary duty claim because such is an impermissible claim for compensatory damages.

However, contrary to Duke's assertion, Plaintiffs do not seek to solely impose personal liability upon Duke to pay a sum of money for Duke's alleged failure to provide adequate notice of the plan conversion. Plaintiffs' complaint also requests an injunction retroactively reforming the Plan and the appointment of an auditor as remedies for Duke's alleged breaches of fiduciary duty. Despite Duke's characterization of the relief requested by Plaintiffs, the complaint does not indicate that Plaintiffs are seeking only restitution for their misrepresentation claim. Plaintiffs may be entitled to seek the appointment of an independent auditor and an injunction reforming the plan as remedies for their "misrepresentation" breach of fiduciary duty claim.

With regard to Plaintiffs' breach of fiduciary duty claim based on alleged arbitrary adjustments to participants' opening account balances, the question of whether Plaintiffs may seek restitution for that claim is not currently before the court. The court, therefore, makes no decision at this time as to the relief available for Plaintiffs on their breach of fiduciary duty

claim based on alleged arbitrary adjustments to participants' opening account balances.

II.    Motion to Amend Scheduling Order and the Complaint

Plaintiffs seek to amend the scheduling order and leave to amend their complaint to add a seventh cause of action and additional factual allegations concerning their breach of fiduciary duty cause of action.  Duke has indicated that it does not oppose the addition of factual allegations concerning Plaintiffs' breach of fiduciary duty cause of action; however, Duke does object to Plaintiffs' proposed amendment adding a seventh cause of action.  Plaintiffs' proposed seventh cause of action alleges that Duke failed to provide notice of the plan conversion in violation of § 1054(h) of ERISA.

The initial scheduling order in this case was issued on January 8, 2007, and set April 9, 2007, as the deadline for amending the pleadings. [Docket Entry #60, at ¶ 4]].  On March 5, 2007, by consent of the parties, an amended scheduling order was issued which moved the deadline for amending the pleading to its current deadline of June 11, 2007. [Docket Entry #66, at ¶ 4].  On October 9, 2007, by consent of the parties, the court issued a second amended scheduling order. [Docket Entry #114].  This time, however, Duke did not consent to resetting the deadline for amending the pleadings.  On October 19, 2007, more than four months after the deadline for amending the pleadings passed, Plaintiffs filed the instant motion to amend the scheduling order and the complaint.

A scheduling order is not set in stone, "but may be relaxed for good cause, extraordinary circumstances, or in the interest of justice." *Barwick v. Celotex Corp.*, 736 F.2d 946, 954 (4th Cir. 1984); *Wall v. Fruehauf Trailer Servs., Inc.*, 123 Fed. Appx. 572, 576, 2005 WL 428781, at *3 (4th Cir. February 24, 2005).

56

The parties in this case appear to be in agreement that when a motion to amend the pleadings is filed after the scheduling order's deadline for amendment of pleadings has passed, the party seeking amendment must satisfy the requirements of Rule 15(a) and Rule 16(b).  The Fourth Circuit Court of Appeals has yet to address in a published opinion whether a motion to amend filed after a scheduling order's deadline for the amendment of pleadings should be analyzed under Rule 15(a), Rule 16(b), or both.  Although the unpublished Fourth Circuit opinions on this issue appear to be inconsistent,[22] the majority of Circuit Courts and most district courts within the Fourth Circuit have required the movant to first satisfy the "good cause" requirement of Rule 16(b) before considering the proposed amendment under Rule 15(a).[23]

The parties cite *Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co.* for the proposition that when a scheduling order's deadline for amendments has passed, a party seeking leave to

---

[22]     *Cf. James River-Norwalk, Inc. v. Burch Roofing Co., Inc.*, 891 F.2d 287, 1989 WL 141656, at *2 (4th Cir. Nov. 16, 1989) (unpublished) (holding that "after a scheduling order has expired, the considerations of Rule 16(b) are not relevant to the analysis of a motion for leave to amend pursuant to Rule 15"); *Vercon Constr., Inc. v. Highland Mortgage Co.*, 187 Fed.Appx. 264, 2006 WL 1747115, at *1 (4th Cir. June 20, 2006) (unpublished) (stating "when granting leave to amend . . . would require modifying the district court's scheduling order, Federal Rule of Civil Procedure 16(b) requires that the movant must first show good cause").

[23]     *See O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154-55 (1st Cir. 2004); *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003); *S & W Enters., L.L.C. v. SouthTrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437-38 (8th Cir. 1999); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992); *United States v. Godwin*, 247 F.R.D. 503, 506 (E.D.N.C. 2007); *Ward v. Beaufort County Det. Ctr.*, Civil Action No. 2:04-792-RBH, 2006 WL 2927439, at *2 (D.S.C. Sept. 8, 2006); *DeWitt v. Hutchins*, 309 F. Supp. 2d 743, 748 (M.D.N.C. 2004); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 631 (D.Md. 2003); *Waldron v. Interactive Bus. Sys., Inc.*, 45 Fed. R. Serv. 3d 365, 1999 WL 33455148, at *2 (E.D.N.C. Oct. 4, 1999); *Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co*., 986 F. Supp. 959, 980 (D.S.C. 1997); *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995); *but see Arbaugh v. Board of Educ.*, 329 F. Supp. 2d 762, 767 (N.D.W.Va. 2004) (concluding that leave to amend a pleading should be granted unless prejudice, bad faith, or futility is shown regardless of the "good cause" requirement under Rule 16(b)).

amend must satisfy the "good cause" requirement under Rule 16(b) in addition to the requirements for amendment under Rule 15(a). 986 F. Supp. 959, 980 (D.S.C. 1997). The court stated that when a motion to amend the pleadings is filed after the scheduling order's deadline for amendments of pleadings has passed, a "two-step analysis" is required. *Dilmar*, 986 F. Supp. at 980. *First*, the party seeking the amendment must demonstrate to the court that it has a "good cause" for seeking modification of the scheduling order under Rule 16(b). *Id*. *Second*, the party seeking amendment must meet the requirements for amendment of pleadings under Rule 15(a). *Id*.

The "good cause" requirement of Rule 16(b) is unlike the more lenient standard of Rule 15(a) in that Rule 16(b) "does not focus on the bad faith of the movant, or the prejudice to the opposing party," but focuses on the diligence of the party seeking amendment. *Dilmar*, 986 F. Supp. at 980. "Good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts. *Id*. (citing 6A Wright, Miller & Kane, Federal Practice and Procedure § 1522.1 at 231 (2d ed. 1990)); *see also* Advisory Committee's note to 1983 amendments to Rule 16. The Fourth Circuit has noted that a finding of "good cause" was justified under Rule 16(b) where *some* of the evidence needed by the Plaintiff to prove his or her claim did not surface until after the amendment deadline. *In re Lone Star Indus., Inc. Concrete R.R. Cross Ties Litigation*, 19 F.3d 1429, 1994 WL 118475, at *11 (4th Cir. April 7, 1994) (unpublished) (finding abuse of discretion in district court's refusal to allow amendment to add new claim after scheduling order deadline). Thus, "good cause" under Rule 16(b) exists "when evidence supporting the proposed amendment would not have been discovered 'in the exercise of reasonable diligence' until after the amendment deadline had passed." *Interstate Narrow*

58

*Fabrics, Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 460 (M.D.N.C. 2003). "Good cause is

not shown when the amendment could have been timely made." *Interstate Narrow Fabrics*,

218 F.R.D. at 460. If the Plaintiffs can establish "good cause," the court will then analyze the

motion to amend under Rule 15.

Plaintiffs seek leave to amend the complaint to add a seventh cause of action, which

alleges a violation of § 1054(h) of ERISA. At the time of Duke's conversion to the cash

balance plan, § 1054(h) stated that a defined benefit plan:

> may not be amended so as to provide for a *significant reduction in the
> rate of future benefit accrual*, unless, after adoption of the plan
> amendment and not less than 15 days before the effective date of the
> plan amendment, the plan administrator provides a written notice,
> setting forth the plan amendment and its effective date, to . . . each
> participant in the plan.

Accordingly, Plaintiffs proposed amended complaint alleges that:

> Duke Energy adopted actual Plan amendments containing the cash
> balance feature for its retirement plan no earlier than December 23,
> 1996. Duke Energy implemented the new Cash Balance Plan effective
> January 1, 1997. The adoption and implementation of the Cash
> Balance Plan effected a significant reduction in the rate of future
> benefit accruals. Duke Energy has to date not notified Plan
> participants of the significant reduction in the rate of future benefit
> accruals. . . .

> Duke Energy adopted resolutions on November 23, 1998 merging the
> PanEnergy and Nantahala Plans into the Duke Cash Balance Plan.
> The merger went into effect at the close of December 31, 1998. The
> merger of the PanEnergy and Nantahala Plans into the Duke Cash
> Balance Plan effected a significant reduction in the rate of future
> benefit accruals. Upon information and belief, Duke Energy has to
> date not notified PanEnergy and Nantahala Plan participants of a
> significant reduction in the rate of future benefit accruals. . . .

> By adopting and implementing the Cash Balance conversion without
> providing notice of a significant reduction in the rate of future benefit

accruals at least 15 days before the amendment's effective date, Duke Energy violated ERISA Section 204(h), 29 U.S.C. § 1054(h), which required that notice of the reduction precede implementation by at least 15 days.

[Proposed Amended Complaint, at ¶¶ 124-26, Docket Entry #116-2].

Duke argues that Plaintiffs cannot establish "good cause" under Rule 16(b) because the Plaintiffs had sufficient information to form a good faith belief that the conversion had significantly reduced their rate of benefit accrual and that they had not received adequate notice of such reduction. Plaintiffs contend that Duke's position that Plaintiffs had sufficient information to plead a class-wide § 1054(h) notice claim ignores the mandates of Rule 11. Plaintiffs argue that Rule 11 requires that they possess more than speculation "based on information relating only to the six named Plaintiffs to ethically seek what Duke characterizes as "draconian" relief invalidating the cash balance amendment." [Plaintiffs' Supplemental Memorandum in Support of Motion to Amend, at pg. 6, Docket Entry #179].

Plaintiffs direct the court's attention to a number of facts they contend were not discovered until after the June 11, 2007 amendment deadline. For instance, Plaintiffs state they did not discover until after the deadline that:

1) The process for calculating Cash Balance Plan opening balances reveals a secret "Step 5" whereby Duke would make arbitrary adjustments to account balances in purported attempts to avoid the notice requirement;

2) Duke subsequently confirmed in internal e-mails that it did not issue a § 1054(h) notice;

3) An analysis by William M. Mercer, Inc. ("Mercer") set forth the reduction in value of retirement benefits the year after the Cash Balance Plan was implemented for participants under age 60;

60

4)      Analyses by Mercer were prepared for Duke quantifying arbitrary adjustments to selected participants' opening balances in attempts to avoid ERISA's notice requirement;

5)      Subsequent analysis by Mercer for Duke increased the extent of the number of participants who, according to their calculations, experienced a decrease of future benefits under the new Cash Balance Plan compared to the prior plan;

6)      A Mercer analysis of participants' benefits conducted after the conversion detailed the number of employees who experienced a reduction in projected benefits after age 65 under the Cash Balance Plan.

[Plaintiffs' Memorandum in Support of Motion to Amend Scheduling Order and Motion for Leave to Amend the Complaint, at pg. 3, Docket Entry #116-3]. However, despite Plaintiffs' contention that they did not discover certain facts until after the scheduling order deadline passed, Plaintiffs cannot establish that they were diligent in seeking the amendment or that they could not have amended their pleadings to add a § 1054(h) notice claim before the June 11, 2007 deadline.

Plaintiffs' reliance on Rule 11 and their argument that they could not have in good faith brought a class wide notice claim before the June 11 deadline is somewhat disingenuous. In Plaintiffs' Memorandum in Support of their Motion for Class Certification, filed on April 27, 2006, approximately 14 months before the scheduling order deadline, Plaintiffs stated "*Duke failed to notify plan participants of a significant reduction in the rate of future benefit accruals 15 days prior to the January 1, 1997 effective date in violation of ERISA § 204(h), which prohibits such plan amendments without notice of the reduction.*" [Plaintiffs' Memorandum in Support of their Motion for Class Certification, at 3, Docket Entry #33-2]. This statement was not buried in a footnote or mentioned in passing within another argument,

61

but was set apart as one of eleven separate and specific class allegations, which, at the time, Plaintiffs argued supported their position that class treatment was appropriate for this case.

> Rule 11(b) provides in part that:
>
>> By presenting to the court a pleading, written motion, or other paper - whether by signing, filing, submitting, or later advocating it - an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . .the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b).  By asserting in their Class Certification Memorandum that Duke violated § 1054(h) by failing to provide notice of a significant reduction in future benefit accruals, Plaintiffs certified to the court that, as early as April 27, 2006, the factual contention that Duke had violated § 1054(h) had evidentiary support or would likely have evidentiary support after a reasonable opportunity for investigation or discovery.  Plaintiffs cannot now, with any credibility, take the position that Rule 11 prevented them from bringing a § 1054(h) notice claim.

Based on Plaintiffs' allegations in their Class Certification Memorandum, as well as their initial complaint, Plaintiffs clearly possessed sufficient facts "to raise the right of relief above the speculative level" before the scheduling order's deadline for amendments. *Twombly*, 127 S.Ct. at 1965.  Well before the deadline, Plaintiffs were aware that: 1) plan participants had suffered a significant reduction in the rate of future benefit accruals; and 2) Duke had failed to provide notice of the plan amendment that effected such a reduction.  The facts which Plaintiffs claim were not discovered until after the June 11, 2007 deadline did nothing

more than confirm what Plaintiffs already believed. If Plaintiffs had enough facts to state a violation of § 1054(h) as a basis for class certification in April 2006, then Plaintiffs clearly possessed enough facts to state a § 1054(h) notice claim that was plausible on its face before June 11, 2007. *Id*. at 1974. This court cannot conclude that Plaintiffs were diligent in seeking the amendment or that the proposed amendment could not have been timely made. Plaintiffs have therefore failed to show "good cause" for modification of the scheduling order under Rule 16(b).

Because Plaintiffs have failed to show "good cause" for modification of the scheduling order, the court need not reach the issue of whether amendment of the pleadings would be appropriate under Rule 15(a).

For the reasons stated above, Plaintiffs' motion to amend the scheduling order and the complaint is granted in part and denied in part. Plaintiffs' motion is granted to the extent that Duke does not oppose the addition of factual allegations related to Plaintiffs' breach of fiduciary duty claim. Plaintiffs' motion is denied with respect to their requested modification of the scheduling order and leave to amend the complaint to add a seventh cause of action.

## Conclusion

Defendants' [Docket Entry #83] motion for judgment on the pleadings is **GRANTED in part** and **DENIED in part**; Plaintiffs' [Docket Entry #98] motion for partial summary judgment is **DENIED**; Defendants' [Docket Entry #106] cross motion for partial summary judgment is **GRANTED**; and 4) Plaintiffs' [Docket Entry #116] motion to amend the scheduling order and the complaint is **GRANTED in part** and **DENIED in part**.

Count One (ERISA Age Discrimination)

63

The "rate of an employee's benefit accrual" as it is used in ERISA's anti-age discrimination provision applicable to defined benefit plans, 29 U.S.C. § 1054(b)(1)(H)(i), refers to an employer's inputs to the plan, not the output of the plan. Cash balance plans are not inherently age discriminatory simply because younger participants have a longer amount of time within which to accrue interest credits. Such is the result of the time value of money. Because the inputs (pay credits and interest credits) to the Plan are credited to each employee's account in an age neutral fashion, Duke's Cash Balance Plan does not violate 29 U.S.C. § 1054(b)(1)(H)(i). Therefore, Duke's motion for judgment on the pleadings is **GRANTED** as to count one. Duke's cross motion for partial summary judgment is also **GRANTED**. Plaintiffs' motion for partial summary judgment is **DENIED**.

Count Two (ADEA)

Plaintiffs' ADEA disparate treatment claim fails for the same reason as their ERISA age discrimination claim. However, Plaintiffs have stated an ADEA disparate impact claim based on the "wear away" effect. Accordingly, Duke's motion for judgment on the pleadings is **GRANTED in part** and **DENIED in part** with regard to count two.

Count Three (Improper Lump Sum Calculation)

Count three is a technical claim that will require expert and factual testimony. A reasonable interpretation of the Plan documents provides that Duke utilize the Treasury Bond rate to convert the cash balance account to a single life annuity and a 4% interest rate to reduce the single life annuity to present value. Under Plaintiffs' interpretation of the Plan documents, Duke was required to perform a whipsaw calculation resulting in higher lump sum distributions than those actually received. Accepting Plaintiffs' allegations as true, Plaintiffs

64

have stated a claim for improper lump sum calculations.  Duke's motion for judgment on the pleadings is **DENIED** with respect to count three.

Count Four (Improper Interest Rate Credit - 1997 and 1998 Plan Years)

Duke does not dispute that it used an interest rate credit that was different than the one provided for in the Plan, rather Duke argues that it used the interest rate credit reflected in the SPD.  At this stage, count four turns on whether the SPD or the Plan terms govern when there is a conflict between the SPD and the Plan.  Because Duke represented to its employees that the Plan document controls if a conflict arises between the Plan document and the SPD, Duke cannot repudiate this representation and rely on the terms of the SPD.  Additionally, the court found that Plaintiffs had exhausted their administrative remedies or, alternatively, exhaustion is excused as futile.  Duke's motion for judgment on the pleadings is **DENIED** with respect to count four.

Count Five (Backloading)

The rate of benefit accrual under Duke's Cash Balance Plan does not violate ERISA's anti-backloading rule.  Because the rate of benefit accrual under Duke's Cash Balance Plan is the result of a plan amendment, the only relevant formula for purposes of the anti-backloading rule is the Cash Balance Plan formula.  Considering only the formula used by the Cash Balance Plan, the Cash Balance Plan does not violate ERISA's anti-backloading rule. Therefore, Plaintiffs have failed to state a claim for violations of ERISA's anti-backloading rule and Duke's motion for judgment on the pleadings is **GRANTED** as to count five.

Count Six (Breach of Fiduciary Duty - 29 U.S.C. § 1132(a)(3))

Plaintiffs' breach of fiduciary duty claim based on Duke's alleged misrepresentation to

participants of the effects of the conversion to the Cash Balance Plan survives Duke's motion for judgment on the pleadings.  However, with regard to the relief requested, Plaintiffs cannot recover restitution for their "misrepresentation" breach of fiduciary duty claim.

Plaintiffs' breach of fiduciary duty claim based on Duke's alleged failure to comply with Plan terms, i.e. errors in the calculation of interest credits and opening account balances, fails because Plaintiffs' claim is actually a claim for benefits for which Plaintiffs have an adequate remedy under § 1132(a)(1)(B).

Plaintiffs' breach of fiduciary duty claim based on the allegation that Duke allowed the Plan to operate in violation of IRS "whipsaw" standards and ERISA's age discrimination and anti-backloading rules fails because Duke was not acting as a fiduciary when it designed and adopted the allegedly illegal cash balance plan.  Plaintiffs appear to concede that point.

Plaintiffs' breach of fiduciary duty claim based on alleged arbitrary adjustments to selected participants' opening account balances in attempts to avoid ERISA's § 1054(h) notice requirement may proceed as Duke did not move for judgment on the pleadings as to that sub-specification of Plaintiffs' breach of fiduciary duty claim.

In summary, as to count six, Duke's motion for judgment on the pleadings is **GRANTED in part** and **DENIED in part**.


**IT IS SO ORDERED**.

Florence, South Carolina
June 2, 2008

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

66